STATE v. JOSEPH MAZON.

*Oath, administration of to witness—Homicide—Judge's Charge.*

1. An oath administered substantially in the form prescribed by statute is sufficient, and hence it was held that the omission of a witness to repeat the words "so help me God," is not assignable for error. The words are no part of the oath.

2. A witness for the state was required to swear that his evidence "against" the prisoner at the bar shall be the truth, &c.; *Held*, that the oath exacts from the witness, under penalties of perjury, all he knows material to the issue, and comprehends as well what mitigates as what tends to establish guilt. But the court recommend that the form prescribed by law be followed.

3. The rule laid down in *Willis'* case, 63 N. C., 26, that the burden of proving matter of mitigation rests upon the prisoner, &c., and affirmed by repeated decisions of the court, is the settled law of this state.

4. The court charged the jury in this case that "if deceased attacked with the rock and knife, the prisoner, not having provoked the fight nor willing to engage in it, might use the necessary means of self-defence, but the jury and not the prisoner must judge of the necessity. And if a deadly weapon was used, and the attack indicated a purpose to endanger the prisoner's life or inflict great bodily harm, he was not compelled to flee, but might defend his person and pursue his adversary, to disarm him, but for no other purpose"; *Held*, no error.

(*State* v. *Paylor*, 89 N. C., 593; *State* v. *Willis*, 62 N. C., 26; *State* v. *Ellick*, 2 Winst., 56; *State* v. *Haywood*, Phil., 376; *State* v. *Smith*, 77 N. C., 488; *State* v. *Brittain*, 89 N. C., 481; *State* v. *Harris*, 1 Jones, 190), approved.

INDICTMENT for murder tried at Spring Term, 1883, of POLK Superior Court, before *Shipp, J.*

Verdict of guilty; judgment; appeal by the prisoner.

*Attorney-General*, for the State.

Messrs. *W. J. Montgomery, D. Schenck* and *Reade, Busbee & Busbee*, for the prisoner.

SMITH, C. J. The prisoner is charged in the bill of indictment with the murder of C. F. Lawrence, committed in the month of June, 1882, and on his trial before the jury was found guilty.

STATE *v.* MAZON.

1. The first exception presented in the record is to the form of the oath taken by the witnesses, none of them repeating its closing words and making a personal appropriation of them to himself by adding "so help me God," and especially to the manner in which the witnesses for the state were sworn.

The oath prescribed by the statute to be administered to every witness in a capital trial is as follows:

"You swear (or affirm) that the evidence you shall give to the court and jury in this trial between the state and the prisoner at the bar shall be the truth, the whole truth, and nothing but the truth, so help you God," Bat. Rev., ch. 77, §6, par. 34; and then the witness is directed to repeat "so help me God," and kiss the Holy Gospels, §1.

The oath was thus taken by the witnesses of the prisoner, except in the omission to repeat, while it was administered to those of the state in this changed phraseology:

"You solemnly swear the evidence that you and each of you shall give to the honorable court and jury against Joe Mazon, the prisoner at the bar, shall be the truth, the whole truth, and nothing but the truth, so help you God," with the like omission.

The discrepancy in the manner of swearing the two classes of witnesses was not observed by the judge, solicitor or prisoner's counsel while the trial was in progress, nor until after the charge; the jury had retired to consider the case and make up their verdict. Then it was discovered by prisoner's counsel, and the fact was made known to the judge and an exception thereto noted.

How this oversight occurred, and why a different oath was administered to the separate classes of witnesses when the law furnishes one form for all, is unexplained, nor does any satisfactory reason therefor occur to us. It is a singular circumstance that the regular mode of swearing one set of witnesses should have been pursued and another mode adopted for the others, and this not communicated by counsel until after the cause had passed into the hands of the jury.

But we are of opinion that the omission and variation do not constitute such substantial departures from the provisions of the

statute as to fatally infect the verdict and entitle the prisoner to another jury. The general assembly could not have intended, in putting in form the different oaths to be taken by officers, public agents and others to insure the faithful performance of their respective duties, to prescribe an inflexible iron formula, admitting of no deviation in words, while the substance is preserved; but rather to direct and point out the essential matters to be embraced in the oath.

To hold invalid an oath that did not follow the very words of the statute, might prove disastrous to the public interests. "Perjury and slander," in the language of the supreme court of Tennessee, "could often find, in slight variances from the prescribed forms of oath, the means of escape from condign punishment which justice invokes. Undoubtedly an oath, administered substantially according to the prescribed form, will be valid, and if taken falsely the party will be guilty of perjury." · *Sharp* v. *Wilhite*, 21 Tenn., 434.

"The legislature did not design," says GREEN, C. J., "to prescribe the precise form of the oath, the slightest deviation from the phraseology of which would prove fatal," *State* v. *Daylor*, 3 Zab. (N. Y.), 49.

"As to the form of the oath, when it is prescribed by statute," remarks Mr. BISHOP, "the statute is to be construed in some sense directory only, so far at least that a departure from the words, in matter not of substance but of form merely, does not exempt the person taking it from the pains of perjury." 2 Bish. Cr. Law, §§862, 982.

A witness for the state was required to swear that his evidence given "against Joe Mazon, the prisoner at the bar, shall be the truth," &c., and this the counsel interprets as imposing an obligation upon the conscience of the witness to testify truly where his testimony is adverse, which does not rest upon his conscience where it may be favorable to the prisoner. If this criticism were well founded, it would be of great force; but in our opinion it is not warranted by the form of the oath taken.

In a general sense every witness is understood to testify for the party introducing him, and the aggregate evidence offered is the evidence of such party. No distinction is drawn between such as sustains the one side or the other. The testimony is said to be for the state or for the accused, accordingly as it proceeds from witnesses produced by the one or the other.

If a witness be produced and sworn for the King, yet if that witness allege any matter in his evidence that is for the prisoner's advantage (as many times they do) that stands as a testimony on oath for the prisoner as well as for the King. Regularly the *King's evidence is given upon oath against the prisoner*, and ought not to be admitted otherwise than upon oath. 2 Hale P. C., 283, 284.

In 4 Chitty's Criminal Law, 313, this form is given for swearing a witness for the King:

"The evidence which you and every of you shall give *for our sovereign Lord, The King, against the prisoner* at the bar shall be the truth, the whole truth and nothing but the truth, so help you God." It cannot admit of doubt that such an oath reaches the conscience of the witness and exacts from him, form under the penalties of perjury, a disclosure of all that he knows material to the issue of the prisoner's guilt, and comprehends just as much what mitigates or excuses the charge as what tends to establish the prisoner's guilt.

Substantially the obligations assumed under either form of oath are the same, and perjury may be assigned in the corrupt withholding of known facts favorable to the accused in the one case as well as in the other.

In reaching this conclusion we wish to mark our decided disapproval of the practice of departing from well established forms, and the more so, where they have been prepared and prescribed by the law-making power.

The other branch of the exception based upon the omission to repeat the words "so help me God" by the witness is equally untenable. Indeed, the very point is disposed of in the recent

case of *State v. Paylor*, 89 N. C., 539, and we should be content with a simple reference to it, but that we find the same ruling to have been made in the court of Queen's Bench in *The Lancaster & Carlisle Railway Co.* v. *Heaton*, 8 Ellis & Black (92 E. C. L. Rep.), 952. In that case, the same words prescribed in the statute, "so help me God," were omitted in taking the oath. LORD CAMPBELL, C. J., in answer to the objection, said the words, "so help me God," were not part of the oath. They only point out the mode of administering it, adding, and such was the decision in *Solomon* v. *Miller*, 3 Exch. (W. H. & G.), 778.

The testimony produced by the state to support the charge was in substance this:

The prisoner, deceased and others were in the employment of the Spartanburg and Asheville railroad company, under the control of one Cook, who on the day of the homicide, ordered the "push-car" to be put on the track. The prisoner came out of the tool-house, with a green hickory stick in his hands some three feet in length and one and a half inches thick, which the deceased, not himself, had been directed to bring out to be made into a handle for a hammer. Cook directed him to put the stick on the car and go to work, instead of which he retained it, a part of the time resting upon his shoulder. Cook, while walking behind the moving car, some 90 or 100 yards from it, saw the prisoner and deceased in the road, in a quarrel, and hastened towards them. When about half way he heard the prisoner call the deceased a damned liar, the latter then standing on the track and looking down. The prisoner advanced on him, when deceased picked up a rock and threw it at the prisoner, a part of it striking him on the breast.

The parties then approached each other and met, and prisoner, with the stick in both hands, gave a blow on the side of the head of the deceased, who seemed to be dodging, and knocked him down. In attempting to rise, a second blow was given. The deceased had a knife in his hand, and while apparently dodging, shifted it from one hand to the other.. The blow on the head

brought on concussion of the brain from which death ensued in a few hours. There was some evidence of threats and previous ill will on the part of the prisoner towards the deceased.

The witnesses for the prisoner gave a somewhat different version of the matter. They represent that the offensive words, "damned liar," first came from the deceased, and in response were repeated by the prisoner and applied to the former; that when the rock struck the prisoner, the deceased run at him with an open knife, and when near enough was felled to the ground by the blow given by the prisoner, and a second blow, over the shoulder, was stricken after deceased had fallen from the first; that deceased had carried his knife for 200 or 300 yards, and it was seen by prisoner put up under his sleeve; that when the parties came together after the throwing of the rock, the deceased went under the prisoner, with his knife in hand, bent as if about to cut with it, both advancing to the fight.

This summary of the evidence is sufficient for a proper understanding of the charge and the exceptions to it now to be reviewed on the prisoner's appeal.

These instructions were asked for the prisoner upon the different aspects of the evidence:

1. If the jury find that the prisoner killed deceased with a stick of the dimensions prescribed, the rule laid down in *State* v. *Willis*, that the burden of showing matter in mitigation, excuse or justification to the satisfaction of the jury rests upon the prisoner, does not apply, and if the jury have a reasonable doubt upon the whole evidence, the prisoner is entitled to it.

2. If the matter in mitigation, excuse or justification arise out of the evidence adduced for the state, the burden is not on the prisoner, and he is entitled to the benefit of any doubt arising therefrom.

3. If the parties fought upon a sudden quarrel by consent, with deadly weapons and on equal terms, no undue advantage being taken, the killing is manslaughter.

4. If the prisoner was assaulted by the deceased with the

rock and immediately resented the blow by killing the deceased, acting in heat of blood, his offence is manslaughter.

5. If the deceased after throwing the rock immediately advanced on the prisoner with a drawn knife, intending to kill or inflict some great bodily harm, the prisoner was not bound to retreat, but had a right to stand his ground and kill the deceased, and not only to do this, but to pursue his assailant till out of danger himself, and if in the conflict that followed he slew his adversary, it would be justifiable.

6. If when the prisoner gave the fatal blow he had reasonable ground to believe, and did believe, that deceased was about to take his life or inflict some great bodily harm, he had a right to defend himself, and, if necessary, kill the assailant.

In response to the prayer for instructions, the court proceeded to charge the jury as follows:

After describing the several grades of homicide and declaring the instrument used to be a deadly weapon, to which there was no exception, the court said:

1. If the prisoner made the threats, prepared the stick with a view of provoking and bringing on the fight, and did provoke and bring it on, with intent to use the stick and kill the deceased, his crime would be murder in killing him.

2. If the affray was sudden, both parties being willing to fight, and no undue advantage taken by the prisoner, the killing would be manslaughter.

3. If the deceased made the attack with the rock and a knife, the prisoner not having provoked it nor willing to engage in it, then the prisoner in self-defence might use the necessary means therefor, and that the jury, not the prisoner, must judge of the necessity.

4. If a deadly weapon was used and the attack on the prisoner made so as to indicate a purpose to endanger life or inflict great bodily harm, he was not compelled to flee, but had a right to defend his person and to pursue his adversary to disarm him, but for no other purpose.

At the close of the charge and at the instance of the prisoner's counsel and his suggestion that the jury had not been directed in case they had a reasonable doubt of the guilt of the accused, the court added that if the jury had a reasonable doubt as to the fact of the homicide, the prisoner was entitled to the benefit of it.

The two first instructions asked are but an effort to induce the court to reconsider and reverse its repeated rulings in the assertion and enforcement of the doctrine declared in the case referred to, *State* v. *Willis,* 63 N. C., 26, and the preceding cases of *State* v. *Ellick,* 2 Winst., 56, and *State* v. *Haywood,* Phil., 376, and which has since been affirmed in *State* v. *Smith,* 77 N. C., 488; *State* v. *Brittain,* 89 N. C., 481, and *State* v. *Carland,* at this term, *ante,* 668.

If anything can be settled and put at rest by judicial decisions, this principle has been, and we cannot now permit it to be drawn in question without impairing the confidence which ought to be reposed in the integrity and stability of the judicial administration of the law.

The third instruction requested was given in substantially similar terms.

The response to the fourth instruction, conforming more to the aspect of the evidence favorable to the prisoner, differs from that requested by inserting the additional words, "he, the prisoner, not being willing to engage in the fight and not provoking it," and concluding that "the jury, not the prisoner," must judge of the necessity of the means employed in repelling the assault. The modification gives to the prisoner all the protection the law affords him in mitigation of his act by reason of the heat of blood. But it was proper to qualify the general proposition, by excluding the idea of the prisoner's voluntary participation in bringing on or provoking the fight, or that the law made him the judge of the necessity of resort to a deadly weapon, instead of leaving to the jury to determine whether he had reasonable grounds for his conduct.

The last instruction varies from that asked in one material particular only, and of this the prisoner cannot complain. The jury were told that the prisoner not only was not compelled to flee from the fierce impending assault which menaced life or great bodily harm, "but had the right to pursue his adversary for the purpose of disarming him, and for no other," but they were not directed, in the words of the prayer, that the prisoner could pursue his assailant till out of danger himself, and if a conflict was thus brought on and the prisoner killed the deceased, this act would be justifiable. The charge is more appropriately guarded in confining the pursuit of the deceased to the object of disarming him and averting personal peril to himself. Human life is sacredly guarded by the law, and while indulgence is shown to passion suddenly aroused by adequate legal provocation, as an infirmity in nature, life can never be lawfully taken unless when another is put in imminent peril, and then only where there are no reasonable means of protecting it but to take the life of the assailant. *State* v. *Ellick, supra,* and authorities referred to; *State* v. *Harris,* 1 Jones, 190.

The court might have declined giving this instruction as not called for in any view of the evidence. When the deceased fell under the first, the mortal blow, and was struggling to get up, it can hardly be said that this and the next which fell upon his shoulders were in self-defence and for the prisoner's safety, and this is the most favorable aspect of his case.

Upon the whole, we think the charge obnoxious to none of the objections so earnestly urged in the effort to save his life.

The case seems to have been fairly explained to the jury, and the conclusion they have reached, under the directions of the court, we must leave undisturbed.

There is no error, and this will be certified to the end that the court below proceed to judgment according to the verdict.

No error.                                        Affirmed.