After the arraignment, the prisoners severally moved for a severance of the trial, upon the ground that the evidence to be offered by the State, which might be competent against the one, would not be against the other, and that the defence of the one, would be antagonistic to that of the other; and that each would insist that the other did the killing.
The motion was denied by the Court, and both the defendants excepted.
By consent, a special venire of two hundred men had been drawn from the jury box, under Sec. 1739 of The Code, in open Court, in the presence of the defendants and their counsel, and duly summoned to attend as jurors. The regular panel was duly perused, and one juror chosen therefrom.
Then the jurors of the special venire were called, and when the first special venireman, so drawn from the box, was passed by the State, he was challenged by the defendants, and on his voir dire, he was asked the following questions by the defendants: "Have you a suit pending and at issue in the Superior Court of Wake County?" Objection by the State, and the question was ruled out by the Court, his Honor holding the only qualification of a juror of the special venire was, that he should be a freeholder. Defendants excepted.
The same juror was then asked this question by the defendants: "Have you paid your taxes for the last preceding year?" Objected to by the State, question ruled out by the Court, and the defendants excepted.
Several other jurors, upon being tendered to the defendants, were asked the same questions on their voir dire, and each question on objection, was ruled out by the Court, and each ruling was excepted to by the defendants.
Neither of the defendants, when the jury was completed and empaneled, had availed himself of the twenty-three peremptory *Page 822 
challenges; the defendant Gooch having challenged only thirteen jurors peremptorily, and the defendant Smith only six.
The deceased was one John A. Cheatham, and it was admitted (990) that the homicide occurred on the 10th day of June, 1885, about half past eight o'clock, p. m., in a store building in the city of Raleigh, which he occupied, and in which he did business at that time.
The store house was proved to be about seventy-five or eighty feet long, and forty or forty-five feet from the door to the stove. The front part of the house was used for groceries, and the back part for the sale of spirits, and was separated by a screen. The defendants were employes of the city government at the time of the homicide, and had been for some time.
James Cheatham, a witness for the State, testified that his brother, John A. Cheatham, was killed on the 10th of June, 1885; witness was his clerk; his brother was thirty-five years of age; and was killed at 8 1/2 o'clock at night. John Hawkins and his brother were at the counter, just below the stove, and witness was near the front door, sitting in a tall arm chair. Smith came in smoking, and passing him, met Hawkins going out, and went into where his brother John was, and asked for his account, and while he was showing him his account, Gooch came in, in his shirt sleeves, and walked down below Smith and John, and stopped. Smith, after examining the account, said it was not correct, that he had paid it two or three times. The deceased told him he could not say that; that he had got every thing on there; that he, Smith, did like he had come there for a row, any way, and he had better go out. Deceased moved over to the opposite counter, and Smith repeated his remark, and made at him for a fight. Deceased got out of a chair he was sitting in, and pushed Smith against the counter, near the stove. Witness ran down to part them, and pulled deceased off. Gooch rushed on deceased while he, the witness, was holding Smith. Deceased called out, "he is cutting me," two or three times. He turned Smith loose, and made for Gooch to part them; and when he got to them, deceased was on the top of Gooch, who was flat of his back. Deceased had his hands on Gooch, with his head (991) turned off; as he stooped to pull deceased off, he felt a cut, Smith cut him on the shoulder, and he turned round on Smith, and Smith cut him in the side. He shoved Smith over some barrels, and made for the bar counter. The deceased had Gooch down, just inside the screen. Witness went to the front door to call some one to telephone for a doctor. The last he saw of Gooch, was when he stooped down and pulled deceased off of him. In returning into the store, he met deceased going towards the door, with his arms up, as if he wanted *Page 823 
to catch him, but he fell on some tubs and churns; he asked him if he was hurt bad, but he did not speak, and died in about ten minutes.
The witness also stated, that the deceased had his hands on Gooch, but was doing nothing else. He saw his hands plainly; saw no knife in his hands; saw Gooch's hand cutting up, about the heart of the deceased. The wounds were on the left side of the face, and two others on his breast, near his heart. The defendants were both working on the streets, and were generally paid by orders on the city. The deceased kept the accounts. Smith had overtraded $23.00, and Gooch had overtraded $32.00, and the deceased had stopped them from trading — Gooch about the last of February, and Smith about the last of March. Gooch said there were some articles in his account which he did get, and he would not pay it. Gooch was an athletic man; the deceased was not as strong a man as Gooch, but about the same size. Smith was not as strong as deceased, and was not quite as strong and heavy as Gooch. Something might have passed between Smith and his brother, which he did not hear. He did not hurt Smith, and was merely holding him. He pulled Smith down on the floor, but did not know whether his head struck the floor or not. He might have been hurt; did not see anything in his hand; did not know whether Gooch had a knife or not.
Scott Brown, a witness for the State, testified, that he examined the wounds of the deceased; one was a little below the left nipple; the other on the right of the nipple; pushed a pencil three inches into the wounds. The one to the right of the nipple went straight (992) in; the other ranged at an angle of forty-five degrees down. The wound on the face was three inches long, extending from the cheekbone to the jaw-bone, and a great deal of blood was on his clothes.
Robert Saunders, a witness for the State, testified, without objection, that in the summer of 1884, he heard Smith and Gooch talking, near the railroad crossing, and overheard Gooch say to Smith, that if John Cheatham "messed" with him, like he did with some of the rest, he would kill "the G_d d__ned long, string-necked scoundrel;" that he had not thought of this since. He was walking along slowly when he heard the remark, and he was fourteen years of age August 5th, 1885.
Laura Lambert testified, that while in the field at work, last June, (1885), one Medlin hallowed that Gooch had killed Cheatham, but that he did not mention Smith, and thereupon Robert Saunders stated the remark, as testified to by him, which he had heard made by Gooch to Smith.
Abe Crabtree testified, after objection, that he saw the defendants together, about sunset, in front of Monie's store, about thirty-five steps *Page 824 
from Cheatham's store; Gooch had a knife, cutting at Smith, as if trying to cut him, and Smith was knocking at him with his fist; they seemed to be fooling. The knife was open, and the blade seemed to be about one and a half inches long.
Turner Evans testified, that defendants came to his restaurant for supper; could not get it, and left together; that Gooch was sober, and Smith a "little drinky". This was about one hour before the killing.
Wesley Hammil testified, that about a month or two before the homicide, he heard Gooch say that the account Cheatham had him charged with, was not right, and if Lambeth (city clerk) paid out any more of his money to Cheatham, he would know how much he was owing him. That he heard Smith say repeatedly, a night or two before the homicide, that Cheatham had not treated him right about his account. This evidence was objected to, and the objection overruled.
On cross-examination, this witness was asked, if there was not (993) a good deal of grumbling among the city hands about the manner of the Cheathams in dealing with them. The Solicitor at first objected to this evidence, but withdrew his objection, and it was admitted. Witness said that he had heard some four or five of the hands complaining about their accounts with Cheatham.
L.P. Sorrell proved the wounds of the deceased, about as described by the witness Scott Brown.
Dr. P. E. Hines testified, that the wounds described would be mortal, and go directly into the heart. They would take a very few minutes to kill. He examined James Cheatham's wounds that night. One was on the left shoulder, penetrated to the hollow, and was a dangerous wound. It was a stab, and there was another wound on the left side.
John Walker, a blacksmith in Raleigh, testified that Gooch came to his shop between eleven and twelve o'clock, to have a horse shod; saw him at the grindstone, grinding, and then whetting something; thinks Gooch cut a string for a boy who came to the shop.
Ed. Jackson testified, that he saw the prisoner at Ellis' Store in Raleigh, just before the deceased was killed, about 8:30 o'clock, some 75 or 100 yards from Cheatham's store. He heard Gooch say to Smith, "Let us go where we are going," but he did not say where he was going. Had heard of Smith's having a little fight, but never heard of Gooch having a fuss.
John H. Alston testified, that he knew Gooch and Smith, and saw them together the night of the killing. They first went to Sorrell's bar room, and then went to Cheatham's store, one after the other. Heard some kind of noise at his store; saw a hand go up; and a coat tail also went up; and then Gooch and Smith came out, side by side. When they reached the middle of the street, the one said to the other, "We *Page 825 
have about finished the d__n scoundrel." Gooch went into the house first, Smith next, and they came out together.
C. W. Bevers, a police officer of the city, helped to arrest Smith at nine or ten o'clock on the night of the homicide. (994) Witness found him in the street, and he went very stubbornly — they pulled him along.
C. D. Heartt, chief of police, testified that on the eleventh of June, he had a warrant for the arrest of Gooch, and searched for him, and directed all of the police force to search for him, but he could not be found. Gooch's time was not up when he left. He had always taken Gooch to be a quiet, peaceable man. Smith had been in several fusses.
F. D. Markham, Sheriff of Durham County, testified that he arrested Gooch on the 12th of June, on the plantation of one Jones, about three and a half miles from Durham. That he found him lying by a wagon belonging to one Huddleston, who worked on the plantation, between two public roads. He tied him and brought him to Raleigh.
The prisoner Gooch testified in his own behalf. He said that he and Smith were together at Ellis', and Smith went out, and told him to wait, he would be back in a few minutes. He came back, and they went to Cheatham's; Smith was sitting on the counter near the stove; Cheatham was sitting in a tall arm chair. Witness told deceased he wanted a half pint of whiskey, and went on down to the bar. He heard deceased say, "if you say that again, I will knock you out of my house with a chair." Deceased then rushed at Smith, and struck him in the face with his fist, and they clinched, just above the stove, towards the front door, about six inches from the stove. James Cheatham pulled them apart, and the deceased's foot caught against the tin or stove leg, and he fell against him and the screen. He fell backwards and tore his pants on a faucet, and the deceased fell on him, and as he tried to get up, James Smith ran up and grabbed deceased and stabbed him. James Cheatham came by their feet, going to the back door. Smith then stepped over them, and cut the deceased in the face. Deceased called out, "he has cut me." Smith then cut at James Cheatham, who ran, while Smith was (995) cutting at him. When he got up, the deceased was sitting on a box, and said to him, "Billy, I am cut." Witness said, "I see you are cut in the face," and the deceased asked him to get a doctor. He went out, and down the street, and he received information that John Cheatham was dead. Witness does not know whether he went there again or not.
W.H. Ellis, introduced by the prisoner Gooch, testified that Gooch and Smith were at his store, five doors north of Cheatham's about seven or eight o'clock on the night of the homicide. They left about *Page 826 
8:30 o'clock. Smith paid $26.50 on his account, and he loaned each of them $1.00. Gooch had no account there. Smith got an order from him for five dollars to pay the deceased. He had a conversation that day with deceased about Smith's account. Deceased seemed to be angry, and said he would have his money, and "Smith had been `monkeying' with him long enough." He communicated what deceased had said to Smith. The prisoners came into his store nearly every day. This evening while at his store, they were talking about some women; neither Smith nor Gooch seemed angry when they left his store; and when he communicated what the deceased said, to Smith, it did not seem to make him angry. After they left his store, Smith came back in about ten minutes, and his nose and mouth were bleeding freely, almost a stream. Blood was coming from both, and not from a scratch. He had a bloody handkerchief to his nose, and witness gave him a pan of water, and then ice water, to bathe his head. Just before Gooch left his store, he borrowed a knife, and returned it before he left the store, to cut a string.
John Morgan, a witness on behalf of Gooch, testified that he was passing the jail on the 12th of June, when Smith called to him, and asked him if they had caught Gooch, and said if they caught Gooch, it would ruin him; told him if he saw Gooch, to get him out of the way. Witness was afterwards put in jail for stealing, and had been in jail four times.
Caswell Smith testified, that he heard Smith tell John (996) Morgan, if he saw Gooch, to get him out of the way, for if they caught Gooch, it would ruin him. He did not hear Smith say he did all cutting, but thinks he did say he would pay Morgan if he would tell Gooch. He had been in jail three months, and was convicted of having whipped his mother.
Another witness, one Williams, testified, that he heard Smith tell Morgan, that if he would go and tell Gooch to get out of the way, he would pay him well; that if they caught Gooch, he would be gone up. Smith, told him, witness, that he did all the cutting. Witness had been in jail since April 1st, for stealing about $1.00 worth of rations.
Lucius Griffith, a witness for Smith, testified that he was in jail, in the adjoining cell to Smith, and he never heard Smith have any talk about Gooch, and neither about having done the cutting; he has been in the penitentiary, and was then in the workhouse for larceny, but some nights he would sleep in jail.
York Lane, a witness for Smith, stated that Ellis told him to take Smith home, on the night of the homicide; he seemed to be drunk; said he wanted to go by Lou Box's and see Billy, (Gooch). They *Page 827 
stopped at Lou Box's, and Smith and Gooch talked about five minutes; they then went on to Askew's corner; heard nothing till after they got back, about Cheatham being killed, saw no blood about Smith's face, and he said nothing about having cut Cheatham.
Dr. Hines was introduced, and testified that he washed and dressed the wounds of James Cheatham, and that he gave substantially the same account of the transaction to him, that he gave in his testimony, only he did not say that he saw Gooch's hand moving up and down.
T. R. Purnell proved John Morgan's character to be bad. Several witnesses proved that Smith was very drunk the night of the homicide.
James Smith testified in his own behalf, in substance, that there was no agreement to go to Cheatham's that night; that he did not make the threats, as the boy Saunders had testified; that he went to Cheatham's to pay a $5.00 order. He was told that (997) Cheatham was mad with him; that Cheatham said if he could not get all, he would not have any; they disputed the correctness of the account; John Cheatham got him by the throat, and shoved him against the counter; James Cheatham ran up, and threw him on the floor, striking him in the mouth with a piece of plank, and pushed John Cheatham over to the right; he got out his knife, and cut James Cheatham, but did not cut John Cheatham; Gooch came out right behind him, and said, "he is cut, and cut bad"; he went to Ellis's to wash his face; he got a lick on the back of his head; his mouth and nose were bleeding; does not remember whether he told Ellis about the affair, he might have told him; went to the depot and saw Gooch; Gooch said, "I am gone, look out for yourself." He came back to the guard house and saw Blake, and told him he did not cut John Cheatham, but that he cut James Cheatham; he did not tell Gooch, as Alston testified, "we have finished the d____d scoundrel;" he had a conversation with Morgan, he asked him if they had caught Gooch, and he said, "I hope they won't catch him;" he never told Robert Williams that he had done the cutting; that James Cheatham, testified before Meyor Dodd, that he, Smith, did not cut John Cheatham, but cut him, James; had a talk about going to see a girl; that he did not attempt to escape.
On cross-examination by Gooch's counsel, he stated that he got permission from Ellis to give Cheatham a $5.00 order, but he did not know whether or not he took the $5.00 order over. Ellis had told him that Cheatham was mad with him, and advised him not to go, and he replied, there was no more danger of a fuss, than between himself and Ellis. That he never knew of John Cheatham using a knife or weapon on any man. *Page 828 
Gooch then had Ellis recalled, and give an account of what Smith stated to him about the affair. He said, that the deceased threw a weight at him, and struck him in the back, and if it had not been for Gooch, he would have been killed. That Smith insisted he was cut, and witness examined him and found he was not. That he told (998) Smith it was a lie about John Cheatham hitting him with a slab, for his face was only scratched. Smith said he "snagged Jim Cheatham twice, and he bleated and ran behind the counter." that Smith said he would go back to Cheatham's, and whip out the whole house. Smith said he was struck with a slab by John Cheatham, but that he saw no bruise on his nose or face, except a scratch. When Smith left his house, he said there was no more danger of a fight with Cheatham, than with him. A number of witnesses, introduced by the State, testified as to the good character of Robert Saunders and James Cheatham, and to the peaceable character of John Cheatham.
Lee King, a witness for Gooch, testified that he saw Gooch the night of the homicide, at Sid Solomon's. Witness told him he understood he had killed Cheatham. Gooch replied, "he had never struck him a lick — never touched him." He advised Gooch to give himself up, if he did not cut Cheatham, and that he heard no talk that night of lynching Gooch.
Ford Taylor was examined as a witness for the State, and testified that James Cheatham's character was good, and that John Cheatham was a quiet and peaceable man. On cross-examination, the witness, who was a former partner of John Cheatham, was asked some questions tending to impute a want of integrity and fair-dealing on the part of the deceased in their mercantile transactions. The Court ruled them out, on the ground that the character of the deceased for violence only, could be put in evidence. The witness further stated, that he never had any personal difficulty with deceased.
G. W. Taylor stated, that he saw Smith at Ellis' store, and he had a handkerchief to his face. Smith said John Cheatham had struck him with a slab, and threw a weight at him. That he was not sober, and there was no blood pouring out his nose and mouth, but he saw blood on his face and handkerchief. His nose and mouth were not dripping with blood.
To prove that the deceased was a dangerous character, the (999) prisoner Gooch introduced W.H. Pace, who stated he one got into a fight with Cheatham. That he first struck Cheatham while sitting down, and no weapons were used, and not much damage done. James Cheatham jumped up and said "kill him", and struck him with a chair. *Page 829 
The defendants next offered B. F. Cheatham, who said he saw Pell come in one day, and get a drink. Pell stuck a knife in John Cheatham. John pushed him off, and Pell fell, and John told him he did not want to hurt him, but took the knife away from him.
James Cheatham described the affair between Pace and the deceased, the same as given by Pace, but stated he did not say "kill him".
The prisoners asked for a number of instructions, all of which were given, except the following, which were refused:
"If Smith was a friend to Gooch, and Gooch meant to assault John Cheatham, who was then engaged in a fight with his friend Smith, when he went towards John Cheatham with his hands raised and open, as testified by James Cheatham, and Gooch at that time had no knife in his hand, and was suddenly thrown upon the floor, as stated by James Cheatham, and was in danger of his life, or of serious bodily injury, or reasonably supposed that he was, and cut John Cheatham to relieve himself from that danger, he was excusable, and is therefore not guilty.
"If James Smith killed John Cheatham through malice, and went to Cheatham's store for that purpose, and Gooch did not know that Smith had such purpose, though Gooch may have joined in the fight to aid his friend Smith, he would not then be a participant in the malicious intent of Smith, and therefore would not be guilty.
"If Gooch went in at Cheatham's store, simply to get a half pint of whiskey, and became suddenly or unwillingly involved in a fight, in no view would he be guilty of murder.
"If Gooch willingly entered into a fight with John Cheatham, upon equal terms, and was suddenly and violently thrown upon (1000) the floor, and John Cheatham got upon him, and the surroundings were such as to justify William Gooch in apprehending serious injury to life, or limb, or body, he had the right to slay his assailant, and would not be guilty.
"In this case, there is no evidence of conspiracy or agreement between Gooch and Smith, the prisoners, to go to Cheatham's store for an unlawful purpose, or to attack the Cheathams, or either of them, or in anywise to injure them, or either of them.
"In trials for homicide, the killing by the prisoner being found or admitted, the law implies malice, and the burden lies upon the prisoner to show, to the satisfaction of the jury, that the killing was done under circumstances reducing the offence to manslaughter, or excusable or justifiable homicide, but when circumstances which come out from the examination of the State's witnesses, tend to establish such defence, then it is the duty of the jury to consider all the evidence, and if they *Page 830 
are not satisfied of the guilt of the accused beyond a reasonable doubt, they should acquit."
The defendant Smith asked the following instructions:
"If the jury shall believe, that there was no conspiracy between Gooch and Smith to kill John Cheatham, or to do him great bodily harm; that the meeting that night at said Cheatham's store was not in pursuance of any preconceived unlawful purpose; that said Smith did not kill John Cheatham, and did cut James F. Cheatham, not with a purpose of aiding Gooch in an unlawful act, but under the impulse of sudden passion, because of violent blows received, they would find Smith not guilty."
The Court, at the request of the Solicitor, gave the following instructions:
"Where two persons agree to do an unlawful act, each is responsible for the act of the other, provided it be done in pursuance of the original understanding, or in furtherance of the common purpose. State v. Simmons,51 N.C. 21; State v. Mathews, 80 N.C. at p. 424.
"Therefore, whether it was the original intention and (1001) understanding of the prisoners to kill the deceased or not, if they agreed together to beat him, or to attack him, and in furtherance of this common design to do such unlawful act, they went to the store of the deceased and made the attack, and in doing so, one of them gave him a mortal stab, the other defendant is just as responsible for the killing, as if he had held in his own hand the knife which inflicted the fatal wound. And he would be equally guilty, if he had not raised a hand to strike, provided he was there present in pursuance of such common purpose, while the other gave the wound.
"It is a general principle of law, that if one man commit a felony, and another be present, aiding or encouraging him to commit it, they are both equally guilty, and the person so aiding and abetting, would be guilty, though his purpose to do so was not formed until the very moment when the act began; that is, if before the completion of the felony.
"It is true, as a general rule, that when two men meet and fight upon a sudden quarrel, on equal terms, no advantage being taken, and one kills the other with a deadly weapon, it will be but manslaughter, and in such case, it matters not which struck the first blow. State v. Chavis, 80 N.C. 358.
"The law presumes malice in every wilful killing of a human being. And where such killing was done on a sudden quarrel, in a mutual combat, the grade of the crime depends upon the character of the provocation. If the provocation be great, it will be but manslaughter; *Page 831 
but if the provocation was slight, and the killing be done out of all proportion to the provocation, it will be murder.
"Abusive words never amount to sufficient provocation to render a homicide manslaughter. If committed on any provocation less than an assaulting of the person, it is murder. State v. Tackett, 8 N.C. 210.
"He that first assaults, has done the first wrong, and if from his so assaulting another, he brings upon himself the necessity of slaying, to prevent being himself slain, he cannot be excused for the homicide, but would be guilty of murder or manslaughter, (1002) according to the circumstances of the case. State v. Brittain,89 N.C. 481.
"If a man assault another with malice prepense, or a preconceived purpose to kill, or do great bodily harm, even though he should be driven to the wall, and kill the other there to save his own life, he is guilty of murder, for the malice of that assault communicates its character to all the subsequent acts. State v. Hill, 20 N.C. 629.
"Where there is a mutual combat without previous malice, but on a sudden provocation, if one of the parties takes an undue advantage, as by the use of a knife, on an unarmed antagonist, and thereby kills him, it is murder.State v. Scott, 26 N.C. 409. But where they fight on equal terms, it is manslaughter.
"The fact of killing with a deadly weapon having been proved, the burden of showing any matter of mitigation, excuse or justification, is thrown upon the prisoner. It is incumbent upon the prisoner to establish such matter, neither beyond a reasonable doubt, nor according to the preponderance of testimony, but to the satisfaction of the jury. State v.Ellick, 60 N.C. 450; State v. Haywood, 61 N.C. 376; State v. Willis,63 N.C. 26. A bare preponderance of proof will not do. State v. Carland,90 N.C. 668; State v. Mazon, Ibid., 683. If the jury are left in doubt as to the extenuating circumstance, it is murder. State v. Smith, 77 N.C. 488.
"The evidence of defendants in trials for crimes, must be taken with some degree of allowance, and the jury should not give it the same weight as that of disinterested witnesses; but the rule which regards it with suspicion, does not reject it, or necessarily impeach it, and if from that testimony, or from it and other circumstances in the case, the jury believe that the defendants have sworn the truth, then they are entitled to as full credit as any other witness. State v. Boon, 82 N.C. 637. While the law regards such testimony with suspicion, it makes it the right and duty of the jury, to consider and decide on the weight which is due to it. State v.Nash, 30 N.C. 35.
"Bare fear, (however well grounded,) that another intends (1003) to kill one, when it is not accompanied by an overt act *Page 832 
indicative of such intention, will not warrant the latter in killing the other by way of prevention. There must be an actual danger at the time.State v. Scott, supra."
The above "requests to charge" having been given, the Court resumed its charge and said:
"There are but three living witnesses of the killing, and each has given you his account of the homicide. You will remember their testimony, in what particulars they agreed, and wherein they differed. It is for you to consider all the testimony, and after weighing it, you are to say what really transpired. As the Court has told you, you can believe the whole, or a part of the testimony of any witness, or reject it entirely, according to the impression of its truth which is made upon your minds.
"If you should believe from the evidence, that Smith and John Cheatham were fighting, and that Gooch intervened and assaulted John Cheatham, without provocation; that John Cheatham got him down, but without having or using on Gooch any weapon, or putting him in reasonable apprehension of danger to his life, or serious bodily harm, (of the reasonableness of which apprehension you are to judge,) and Gooch then killed him with his knife; if you believe those to be the facts, you should find Gooch guilty of murder. There is no other evidence before you that Gooch acted in self-defence, beyond what may be deduced from the evidence tending to show that he and Cheatham were fighting, and Cheatham was upon him. Gooch's testimony is, that he did not cut Cheatham at all. Smith testified that he did not see how it was done. James Cheatham said that John Cheatham had his hands on Gooch, but he saw him have no weapon, and he was not striking Gooch, and there is no evidence before you, that John Cheatham had any knife, or any weapon, on that occasion. If you believe that Gooch made the first assault, and afterwards that Cheatham had him down, when he cut and killed Cheatham, the law presumes malice, (1004) and the burden is on Gooch to satisfy you, that the killing was done to protect his own life, or to save himself from serious bodily harm. If you should be satisfied that he had reasonable apprehension of such, and cut in consequence thereof, you would find him guilty of manslaughter; if not so satisfied, or you are in doubt as to the mitigating circumstances, and you believe the facts to be as recited, you will find him guilty of murder. If under the circumstances named, you are fully satisfied that Gooch was there, under a preconcerted arrangement with Smith, to assault Cheatham, and in pursuance of such plan, a fight ensued in which Gooch killed Cheatham, he would be guilty of murder, even though he struck the *Page 833 
fatal blow under reasonable apprehension of danger to his person or life.
"If you are satisfied beyond a reasonable doubt, that Smith was there by a preconcert with Gooch to assualt John Cheatham, or to draw him into a fight, though they may not have intended to kill Cheatham, and Gooch did kill Cheatham in carrying out such preconceived unlawful purpose, both are guilty of murder. If you believe there was no such preconceived purpose, but are satisfied beyond a reasonable doubt, that Smith was there aiding and abetting Gooch before the fatal blow was given, and Gooch did the killing under the circumstances just mentioned, then Smith is guilty of the same grade of offence as Gooch, unless he shows on his own behalf, circumstances of mitigation or excuse. If Gooch is guilty of murder, so would Smith be guilty of murder, in the absence of such mitigating circumstances. If Gooch is guilty of manslaughter, so is Smith guilty of manslaughter, if present aiding and abetting Gooch before the fatal blow was given.
"If you are satisfied beyond a reasonable doubt, that Smith struck the fatal blow, he is guilty of murder, unless you are satisfied that he struck while still in the heat of passion raised by the fight between him and the deceased, in which event you should find him guilty of manslaughter, unless he used an excess of violence out of all proportion to the provocation, or in consequence of a (1005) preconceived arrangement with Gooch to assault Cheatham, in either of which cases, Smith would be guilty of murder. If Smith did the killing, you should find Gooch not guilty, unless you are satisfied beyond a reasonable doubt, that he was there by a preconcert with Smith to assault Cheatham, or if there was no preconcert, that he was there, aiding and abetting Smith, at some time, however short, before the fatal blow was struck, in which case you should apply the principle above laid down, as to aiding and abetting.
"You are sworn men. You are to find your verdict by the law and the evidence alone. You are to allow neither sympathy nor prejudice to sway you, for you are to find the truth of the facts, and the facts cannot be changed by any feelings which may be entertained by you, if any, towards the prisoners. If mercy ought to be extended to either or both of the defendants, you have no right to exercise it. The prerogative of mercy, is, by our laws, vested elsewhere. With the effect of your verdict, you have nothing whatever to do. You impose no sentence and inflict no punishment. Your duty is a plain and straightforward one. You are to weigh the evidence and find the facts — and to apply to the facts as you find them to be, the laws as laid down by the Court, and respond as to each defendant, whether he is *Page 834 
guilty of murder, or guilty of manslaughter, or not guilty. There your duty and responsibility will end."
The defendants did not except to any particular charge, or part thereof, given by the Court, but generally to the charge as a whole.
There was a verdict of guilty. Judgment prayed and pronounced, the Court sentencing the defendants to be hanged on the 17th day of November, 1885.
Both defendants appealed.
Prior to the argument in the case, the counsel of the prisoners moved the Court for a new trial, upon the ground of newly-discovered testimony. The motion is disallowed, for the reason this Court does not entertain such a motion. It was so expressly held at this term of the Court, in the case of State v. Starnes, upon a similar motion.
The prisoners are charged with the murder of John A. Cheatham, in the city of Raleigh, on the night of the 10th of June, 1885. After arraignment, each of the prisoners moved for a severance of the trial. The motion was denied by the Court, and the prisoners both excepted to the ruling. The exception cannot be sustained, for the severance of the trial was a matter of sound discretion, to be exercised by the Court. State v. Smith,24 N.C. 402; and 1 Whar. Cr. Law, Sec. 433.
By consent, a special venire of two hundred men were drawn from the jury-box, under Sec. 1739 of The Code. When the first person's name was drawn from the box, he was challenged by the defendants, and on his voirdire was asked the following questions: "Have you a cause pending and at issue in the Superior Court of Wake county? Have you paid your taxes for the last preceding year? Have you served on a jury within the last two years?" To each of these questions, the Solicitor for the State objected, and the questions were ruled out by the Court, and the juror tendered. To this ruling the prisoners excepted. There were several others called on the list, who were passed by the Solicitor to the prisoners, and the same questions asked, with like results. Neither of the prisoners, when the jury was completed, had availed themselves of the twenty-three challenges to which, by law, they are entitled, the prisoner Gooch having challenged peremptorily only thirteen, and Smith only six.
The question of practice here raised by the exceptions of the prisoners, was decided at this term of the Court, in the case of State v. *Page 835 Hensley, post, 1021. There the Court held, "that the right of challenge is intended to secure a fair and impartial trial, and to that end, to exclude from the jury, persons objectionable for one or another cause. It is no part of the purpose of the right of challenge, to afford the prisoner opportunity to select particular jurors, most likely (1007) to acquit, or give him undue advantage. He has no right to select and have his own choice of jurors, he has only the right to object to twenty-three, without assigning any cause, and indefinitely, for cause allowed by law to be good. He only had the right to except to objectionable jurors, and to have an unobjectionable jury. The conclusive presumption is, that such a jury was obtained, because the prisoner accepted jurors of the panel tendered, until the jury was completed, while he yet had the right to challenge four peremptorily." The rule to be deduced from this decision is, that although the proper challenges by the prisoner of the same panel may be denied him by the Court, it is no ground for a venire de novo, unless he has exhausted his peremptory challenges, for unless that contingency occurs, he is not prejudiced, for he is presumed, by not exhausting his peremptory challenges, to have what he considers an unobjectionable jury. There was, therefore, no error in the ruling of the Court in this particular.
We come now to consider the exceptions taken by the prisoner, upon the omission or rejection of evidence by the Court, and there were such a vast number of exceptions taken on the trial, many of which were too trivial for consideration, and many others, after being first taken, were afterwards avoided in the progress of the trial, by admitting the evidence to which they were taken, that we feel some distrust, lest in the confusion of the evidence and exceptions, we may overlook something that may be of importance.
In reviewing the evidence and the exceptions thereto, we shall only notice those that were taken to evidence that was not subsequently admitted, and consider only such of the instructions asked, as were refused by the Court.
On the examination of James F. Cheatham, the State proposed to prove by him, the nature and character of the wounds he had before stated he had received. The evidence was objected to by the prisoners, but received by the Court, as part of the res gestae, and to show the violence of the transaction. The evidence, we think, (1008) was properly admitted upon both grounds.
Chamblee, a witness for the State, testified, that on the evening of the homicide, about sunset, he saw the prisoners together, about 35 yards from Cheatham's store, and upon the witness being asked what they were doing, the prisoners objected; but the Court admitted the *Page 836 
evidence, and the witness stated that Gooch had a knife, about two and one-half inches long, cutting at Smith, as if he were trying to cut him, and Smith was knocking at him with his fist; "they seemed to be fooling". He saw Gooch and Smith together nearly every evening about that time. The evidence was admissible. It was competent to show when and what the prisoners were doing that evening, and it was admissible to show that Gooch had a knife that evening, as evidence was offered by the defence, tending to show that he had none.
Wesley Hamilton, testimony on the part of the State, as to the declarations of the two prisoners regarding the deceased, and their accounts at his store, was objected to by both the prisoners. The testimony was competent, to show the dissatisfaction of the prisoners with their accounts, and as tending to support the contention of the State, that they bore a grudge against the deceased on that account.
They then asked the same witness the question: "Have not you known it to be frequently to be the case, that the Cheathams' have presented to the city hands, accounts double what was really due?" This question was objected to by the State, and ruled out by the Court. The defence insisted that the question was admissible, to rebut the testimony of Robert Sanders, who had testified that he heard Gooch, the summer before, say to Smith, that if Cheatham "messed" with him as he did with other hands, he would kill him. It was insisted that it was offered to explain what was meant by "messing", to rebut the disputing the account, by which the State claims to show malice, and to show that the condition named in the threat testified to by Sanders, never existed.
We do not see how the refusal to admit the answer to the (1009) question could prejudice the prisoners, for evidence was offered by the prisoners tending to show deceased kept false accounts, and was a man who dealt hardly with his customers, and it could only have the effect of showing that the prisoners may have had just ground of complaining of their accounts, and was calculated to engender the ill feeling which the State alleged they entertained towards the deceased on that account. Such evidence, it seems to us, only tended to strengthen the allegation of the State in that particular, and was in fact prejudicial to the defence. The answer to the question, so far from showing that the condition contended for on the trial never existed, would tend to show that it did there exist. It was, if the deceased, "messed" with him, as he did with others, that is, make out a false account against him, he would kill him, for both the prisoners complained of their accounts, and alleged them to be unjust. *Page 837 
Questions were put by the prisoners to the witness Lambeth, the City Clerk, as to the temper of the deceased towards the prisoners, and whether he seemed to be mad with Smith, the day of the homicide, and did he know from anything he said that day, that he was mad with Smith. These questions were ruled out by the Court, and the prisoners excepted.
We are unable to see how the temper or anger of the deceased towards the prisoners, can be relevant to the question of their guilt or innocence. In a case of homicide, the question is, was the act of killing done by the prisoners with malice, and that question can in no way be affected by the fact that the deceased bore malice towards the prisoners. Besides, if the questions were material, they were fully answered by the witness Ellis, who stated that the deceased was angry with Smith, and he communicated what the deceased said on the same day to Smith, and that night advised him not to go to the Cheathams'.
Ford Taylor, a witness for the State, was asked several questions by the defence, for the purpose of attacking the character of the deceased, in relation to his mercantile transactions. They were ruled out, on objection by the Solicitor, and properly so, for the moral character of the deceased was in no way involved in the question of the guilt of the prisoners. The only inquiry that could be made about his character, was whether he was a violent and dangerous (1010) man, and only then, "when the evidence is wholly circumstantial, and the character of the transaction is in doubt," or when "there is evidence tending to show that the killing may have been done on the principle of self-preservation." State v. Turpin, 77 N.C. 473. But the facts of this case do not bring it within either exception.
The last exception taken by the prisoners, was by Gooch, to the ruling of the Court in permitting the Solicitor to re-call and re-examine a witness. This, as it has often been decided, is a matter entirely in the discretion of the Court.
The three first instructions asked by the prisoners, which were refused by the Court, are all predicated upon an assumed state of facts, not warranted by the record. They are based upon the idea that Gooch was driven by the necessity of the emergency in which he was placed, to take the life of the deceased, and therefore he was excusable, or at most not guilty of murder. But in no view of the case, are the prisoners excusable. This offence is either murder or manslaughter.
The prisoners then asked the Court to instruct the jury, "that when a prisoner, relying upon extenuating circumstances to reduce the offence from murder to manslaughter or excusable homicide, and the circumstances come out from the State's witnesses which tend to *Page 838 
establish such defence, then it is the duty of the jury to consider all the evidence, and if they are not satisfied of the guilt of the accused beyond a reasonable doubt, they should acquit." Whatever apparent reasonableness there may be in the proposition here contended for, the rule in that respect has too often been recognized by this Court, to allow a departure from it at this time. See the cases of the State v. Mazon, 90 N.C. 676;State v. Carland, Ibid., 668; State v. Willis, 63 N.C. 26; State v.Ellick, 60 N.C. 450; State v. Brittain, 89 N.C. 481.
The Court was next asked to instruct the jury, "that there (1011) was no evidence of any conspiracy or agreement between Gooch and Smith, the prisoners, to go to Cheatham's store for an unlawful purpose, or to attack the Cheathams, or in anywise to injure them or either of them." The Court declined to give the instructions, and left that question to the jury.
The Court, in view of the facts of the case, could not give this instruction, and instead thereof charged, "If you are satisfied beyond a reasonable doubt, that Smith was there by preconcert with Gooch, to assault John Cheatham, or draw him into a fight, though they may not have intended to kill Cheatham, and Gooch did kill Cheatham in carrying out such preconcerted unlawful purpose, both are guilty of murder." This presents the main point in the case, upon which the question of murder depends, and raises the question, was there any evidence of a preconcert between the prisoners to assault the deceased, or draw him into a fight. If there was such evidence, it is unnecessary to consider the case in any other aspect. What then, is the evidence tending to show a preconcert between the prisoners for such an unlawful purpose? The prisoners were boon companions; they were co-laborers in the same employment; they were generally seen together, late in the evening, in that part of the city near the store of Cheatham; they both had accounts with Cheatham; twelve months before the homicide, while together, Gooch said to Smith, referring to the false accounts made by Cheatham against some of the street hands, "If Cheatham ever `messes' with me as he does with some others, I'll kill him." They both had accounts in 1885, with Cheatham, and each complained that the account against him was unjust; and credit had been refused to both of them by Cheatham, in the spring preceding the homicide. Some short time before the homicide, they were together at Ellis' store; left together, and as they were leaving, the one said to the other, "let's go where we are going," and they went to Cheatham's store. Smith went down in the store, if James Cheatham is to be believed, to where the deceased was, and asked for his account, and while deceased was showing him his account, Gooch went into the *Page 839 
store in his shirt sleeves, and walked down and stopped (1012) between deceased and Smith. Smith, after examining the account, said it was not correct, that he had paid it two or three times. Deceased replied, he could not say that, that he had got every thing on there; that he did like he had come in there for a row any way, and he had better go out. The deceased then moved over to the opposite counter, and sat in a chair. Smith repeated the remark, and made at him for a fight; the deceased got out of the chair, and pushed Smith against the counter. James Cheatham parted them by pulling deceased away, and holding Smith, and while holding Smith, Gooch rushed on deceased, who cried out two or three times, "he is cutting me." James Cheatham then turned Smith loose, and hastened to part them. Gooch was flat on his back, and deceased was on top of him, with his head turned off, and as James Cheatham stooped to pull deceased off, Smith cut him on the shoulder, and as he turned, he cut him again in the side.
The deceased was stabbed in three places, one would on the left side of the face, from the cheek to the jaw-bone — one a little below the left nipple, and the other on the right of the nipple. The last went straight in, and the other ranged down, at an angle of 45 degrees. The prisoners left this scene of blood together, and when they reached the street, the one said to the other, "We have about finished the d__n scoundrel." Smith went to Ellis' bleeding from a scratch on his face, and telling with exultation, "that he had `snagged' Jim Cheatham twice, who `bleated' and ran behind the counter," and said "he would go back to Cheatham's and whip out the whole house." These facts, if believed by the jury, and they were testified to by James Cheatham, whose character was proved to be good, were surely some evidence of a preconcert between the prisoners to attack the deceased. Their conduct during the fight, offers some evidence of a common purpose, if not an express agreement, to stand by and assist each other, if either should get into a fight with the deceased. Gooch, armed with a deadly weapon, follows Smith into the store, and takes his stand near by, as if ready to join in the bloody drama, as soon as the (1013) play is opened. Smith uses offensive language, calculated to provoke the deceased to an assault, and failing in this, makes the assault himself; and as soon as he and the deceased are separated, Gooch rushes, without the slightest provocation, upon the deceased, and during their short contest, when the deceased is unarmed and using no violence upon his person, except that of being on him, which Gooch himself says was by accident, he gives him two or three stabs, one or two of which are mortal; and then when James Cheatham interferes, as a peacemaker, to separate the combatants, Smith inflicts two *Page 840 
severe stabs upon him, and then to show the mala mens by which they were actuated, on leaving the house, Gooch uses the language testified to by Alston, which indicated a remorseless and vindictive spirit, which had accomplished its purpose. Gooch testified that Smith did the cutting, and Smith admitted in his testimony that he had cut James Cheatham, but denied that he had cut John Cheatham. It is certain that he was cut by the one or the other, and we think from the nature of the wounds as described, they must have been inflicted by Gooch, as testified by James Cheatham. But be that as it may, there being some evidence produced before the jury that there was a common purpose on the part of the prisoners to assault or beat John Cheatham, and in pursuance of that common design he was assaulted and killed, both the prisoners would be guilty of murder, and the jury were warranted in so finding.
Lord Hale, in vol. 1, p. 440 of the Pleas of the Crown, thus lays down the doctrine on the subject: "If divers persons concur in an intent to do mischief, as to kill, rob, or beat another, and one did it, they are all principals, and if many be present, and only one gives the stroke whereof the party dies, they are all principals, if they came for that purpose."
And in State v. Simmons, 6 Jones, 21, this Court held: "When on a trial for murder, it appeared that two persons had formed the purpose of wrongfully assaulting the deceased, and one of them, in furtherance of such purpose, with a deadly weapon and without (1014) provocation, slew him, it was held both were guilty of murder."
In Regina v. Cox, 4 C. P., 538, the rule is thus laid down: "If two persons are engaged in pursuit of an unlawful object, the two having the same object in view, and in pursuit of that common object, one of them does an act which is the cause of death, under such circumstances that it amounts to murder in him, it amounts to murder in the other also."
There is another view of the case, in which the jury might have been warranted in finding the prisoners guilty of murder, and it is this. If the jury believed from the evidence, that the prisoners went to the store of Cheatham, with the purpose, under the pretense of fighting, to stab Cheatham, and either the one or the other stabbed and killed the deceased, it was murder in the assailants, no matter what provocation was given, or how high the assailants passion was aroused during the fight, for the motive in such a case is express, State v. Lane, 26 N.C. 113; or if they believe from the evidence, that Gooch had prepared himself with a knife, with the intention of using it in case he or Smith got into a fight with the deceased, and went to Cheatham's store with the intention of having a conflict with him, and did kill him *Page 841 
with the knife, and Smith, having a knowledge of the purpose, went with him, and was present assisting in the conflict, the jury were well warranted in finding them both guilty of murder. State v. Hogue,51 N.C. 381.
There is still another view of the case which sustains the verdict of the jury. Although they might believe there was no previous purpose on the part of the prisoners to assail the deceased, and they went to his store for a lawful purpose, and got into a sudden combat with the deceased, and they believed that the provocation given by the deceased was but slight, and in the progress of the fight, the prisoners used an excess of violence, out of all proportion to the provocation, the killing was murder. State v. Chavis, 80 N.C. 353; State v. Curry, 46 N.C. 280;State v. Hildreth, 31 N.C. 440. In this last case it was held, "if a party enters into a contest, dangerously armed, and fights under an unfair advantage, though mutual blows pass, (1015) it is not manslaughter, but murder."
Our conclusion is that there is no error. This opinion must therefore be certified to the Superior Court of Wake County, that the sentence of the law may be pronounced.
No error. Affirmed.
Cited: S. v. Jones, 97 N.C. 472; S. v. Potts, 100 N.C. 462; S. v.Ellis, 101 N.C. 767; S. v. Pankey, 104 N.C. 844; S. v. Oxendine,107 N.C. 784; Jenkins v. R.R., 110 N.C. 441; S. v. Whitson,111 N.C. 700; S. v. Rollins, 113 N.C. 733, 734; S. v. Finley,118 N.C. 1164, 1171; S. v. Jimmerson, 118 N.C. 1175; Hampton v. R.R.,120 N.C. 539; S. v. Moore, 120 N.C. 571; S. v. Perry,121 N.C. 535; S. v. Edwards, 126 N.C. 1055; S. v. Council,129 N.C. 513; S. v. Bishop, 131 N.C. 760; S. v. Register,133 N.C. 754; S. v. Exum, 138 N.C. 607; S. v. Worley, 141 N.C. 768; Ivesv. R.R., 142 N.C. 137; Medlin v. Simpson, 144 N.C. 399; S. v.Banner, 149 N.C. 523; S. v. Peterson, 149 N.C. 534; Blevins v. Cotton Mills,150 N.C. 497; S. v. Holder, 153 N.C. 607; S. v. Cox, 153 N.C. 642; S. v.Blackwell, 162 N.C. 682; S. v. Robertson, 166 N.C. 362; S. v. Ice Co.,166 N.C. 404; Long v. Byrd, 169 N.C. 660; S. v. Johnson, 172 N.C. 924;S. v. Little, 174 N.C. 802; S. v. Jones, 175 N.C. 714; S. v. Carroll,176 N.C. 731; S. v. Southerland, 178 N.C. 677, 678; S. v. Rideout,189 N.C. 163; S. v. McClain, 240 N.C. 174. *Page 842