## STATE *v.* AUSTIN HILL, CORNELIUS WILLIAMS and ALFRED WALKER.

In an indictment against three for murder, charging that H, one of the prisoners, fired the gun, and that the other two were present, aiding and abetting: *Held,* that it was not error in the Court below, to charge the jury, that if either of the prisoners fired the gun, the others, being present aiding and abetting, were equally guilty.

Where, in an affidavit filed for the removal of a prisoner's case, the facts, whereon the belief is founded are set forth, so that in the language of the statute "the Judge may decide upon such facts whether the belief is well founded," the Judge acquires complete and final jurisdiction, his decision not being the subject of review by this Court.

(*State* v. *Cockman,*, Winst. 95; *Twitty's case,* 2 Hawks 248; *State* v. *Seaborn,* 4 Dev. 305; *State* v. *Hildreth,* 9 Ired. 429; *State* v. *Collins* and *Blalock,* 70 N. C. Rep. 241, cited and approved.)

INDICTMENT FOR MURDER, tried before *Henry, J.,* at Fall Term, 1874, NORTHAMPTON Superior Court.

The defendant Austin Hill, upon affidavit moved for the removal of the case from Northampton county. The following is the affidavit upon which the motion was based, to wit:

" State
v.
Austin Hill, Cornelius Williams
and Alfred Waker.

The defendant Austin Hill makes oath that there are probable grounds to believe that justice cannot be obtained in this county, and he founds his belief upon the fact that the case has been very much canvassed and talked about by all clases of people in said county, greatly to his prejudice; many men of position and influence in society have manufactured a prejudice against him, which he fears would prevent justice here.

his
Signed      AUSTIN X HILL.
mark.

The motion was overruled by the Court and the defendant excepted.

The defendant Hill, with the other defendants, then moved for a severance. The motion was overruled and the defendants excepted.

Mrs. Presson, the widow of deceased, was introduced as a witness on the part of the State, and testified as follows:

That soon after the clock struck nine P. M. she, her husband and the family retired, that soon thereafter some person spoke from the top of the hill, saying that Dr. Ramsay had two horses, which he wished the deceased to put in the stable. She did not recognize the voice of that person, and did not know who it was. The deceased got out of bed, put on his shoes and no other clothing, and went up on the hill towards the lot. In a few minutes thereafter, she heard a noise like a slamming, and a few minutes afterwards a person came to the door of her house and said, " Miss Alice, your father wants you to send him his pocket book." Alice got up and looked for the pocket book; while she was looking for the pocket book, the person ran off, and soon thereafter the deceased came in and exclaimed, old Cornelius! old Cornelius! old Cornelius has shot me! He also mentioned the name of Austin Hill, but did not say what Hill had done. No light was then in the house, but the lamp was then lighted and it was discovered that the deceased was wounded in the left side of the neck. About three-quarters of an hour afterwards, the witness and her two daughters went up the hill, and by loud cries aroused the neighbors, all of whom were negroes, to wit: Sam Williams, Wyatt Williams and Jack Norwood, and told them that old Cornelius had shot Mr. Presson. Witness, her two daughters and the three ne-groes went back and entered the house, when Mr. Presson took the hand of Sam Williams, and told him something, which witness did not hear.

The State next introduced Martha Alice Presson, a daughter of the deceased, aged fifteen, who testified that her father was watchman of the Weldon bridge, that the family retired

on the night of the homicide in the following order, to wit : her father first, then her mother, then her sister, then herself. That soon after she retired, some one, whose voice she did not recognize, called from the hill and said Dr. Ramsey had two horses which he wanted cared for. Her father kept stables for the accommodation of persons who go to Weldon from this side of the river. That her father hesitated, but concluded to go, got up and put on his shoes, but before he left the house the clock struck nine. The clock was accurate and kept railroad time. That he had not been gone long before she heard something like a slamming. In about fifteen minutes after he left some one came to the house and told her, her father said send him his pocket book. That she recognized the voice of Austin Hill. The door was left open when he went out, she got up and went by the door that was open and passed through an entrance into the dining room, where her father put his clothes, and she saw a man standing at the door. It was Austin Hill. When she returned from the dining room and stated that she could not find the pocket book, he stepped on the top step, but seeing her father coming from the hill he jumped off and run. He father came in and said " strike a light, old Cornelius has shot me." She knew Cornelius Williams, her father always called him Cornelius. She stayed in the house with him about half an hour, when her mother, her sister and herself ran up the hill and screamed. Sam Williams, Wyatt Williams and Jack Norwood came to them. In company with them, they returned to the house. Her father took Sam Williams by the hand and told him something, which the witness did not hear.

The State then introduced Thomas Devereux, who testified that on the night of the homicide he was at J. J. Long's, Norwood plantation, and intended to sleep that night out doors, under a tree, but had not gone to sleep. That about half past eight o'clock he heard a noise as of the feet of horses, apparently going rapidly in the direction of Meed Castle, which is the way to the place of the homicide. On cross examination the defendant's counsel asked the witness if he did not believe

in ghosts, and if he had not frequently heard the noise of ghost horses, and if he could tell the difference of the sound made by real horses?

The witness responded that he had frequently heard the noise of ghost horses, but could tell the difference between that and real horses. His mind manifested to him the difference.

The Solicitor then asked the witness if he was not an illiterate person, not having had the benefit of an education, to which the witness replied that he was.

The witness left the stand, his Honor remarked to the counsel that one of North Carolina's most distinguished Judges was said to have believed in ghosts.

The defendant Williams relied upon an *alibi*.

In his charge to the jury, his Honor said: "It is difficult for any person to swear positively as to time, at night, who has not examined a time piece."

His Honor charged the jury "that the law as laid down by the counsel (naming him) was correct, and that he charged it as the law in this case," but did not repeat the language of the counsel.

His Honor also said that if the jury believed the testimony of Martha Alice Presson, the defendant Hill was present at or near the house of the deceased about the time of the homicide.

That the theory of the State was that Alfred Walker stood at the lower gate of the lot. That the evidence did not show that there were two gates to the lot.

The counsel for the defendant Hill asked for the following instruction:

1. Unless the jury can find from the evidence that the gun, when fired, was in the hands of Austin Hill or Cornelius Williams, they must find Austin Hill not guilty.

2. There is no evidence that the gun was in the hands of Austin Hill when fired.

3. If the dying declarations of the deceased are to be be-

STATE *v.* HILL *et al.*

lieved, the gun was not in the hands of Austin Hill when fired.

The first instruction was denied. As to the second and third, his Honor said that he had already charged the jury that if they believed the defendants were all, or any of them, engaged in the homicide, it was not material who fired the fatal shot, but that all who participated in the deed were equally guilty.

The jury rendered a verdict of guilty. There was a motion for a new trial, the motion overruled and judgment pronounced, and the prisoners appealed.

*W. W. Peebles,* for the prisoners.

*Attorney General Hargrove* and *Busbee & Busbee,* for the State.

BYNUM, J. This is an indictment against the prisoners Hill, Williams and Walker, for the murder of Samuel Presson. The first count charges that Hill fired the gun, and that the other two were present aiding and abetting; the second count charges that Williams fired the gun, Hill and Walker being present aiding and abetting in the homicide.

1. After the evidence was given, the counsel of Hill asked the Court to instruct the jury, that unless they found from the evidence that the gun when fired, was in the hands of Hill or Williams, they must find Hill not guilty. This his Honor refused, and in that there is no error; for suppose the gun was in the hands of neither Hill or Williams, but was in the hands of the other defendant, Walker. In such case all the authorities agree that would be sufficient to warrant the conviction of Hill and Williams, if they were present aiding and abetting. 2 Hale's Pl. Cr. 292, 1 H. P. C., 437, 7 Co. Rep., 67a. 1 Bishop Cr. Procedure, 546, Arch. 6, *State* v. *Cockman,* Winst. 95. How it would have been if some person, not named in the indictment, had fired the fatal shot, we are not called upon to decide, for there is here no allegation or evidence that such was the case.

2-3. The second and third instructions asked for, were that there was no evidence that the gun was in the hands of Hill when fired, and that if the dying declarations of the deceased were to be believed, the gun, when fired, was not in the hands of Hill. These instructions were properly refused, because it was not at all material whether the gun was fired by Hill or not. His Honor in substance and effect charged the jury, that if they were satisfied that the defendants were all, or any of them, engaged in the homicide, it was not material which of them fired the gun. We can see no error in this charge as applied to the very meagre statement of the evidence set forth in the case.

4. When the case came on the prisoner, Hill, filed an affidavit setting forth that he could not have a fair trial in the county, and asked the Court to remove the action to another county for trial, which motion his Honor disallowed. Was this error? It is not denied that the affidavit states the causes for removal as fully as is required by the statute, Rev. Code, ch. 31, sec. 115 ; and the only question is, was the removal a matter of discretion for the Judge. The first Act upon the subject was passed in 1806, which declared that a removal shall take place when a party shall state on oath " that there are probable grounds to believe that justice cannot be obtained in the county," &c. Under this Act some of the Judges had scruples and believed they had no power to deny the application for removal, when such an affidavit was made. It was to remove these doubts that the Act of 1808 was passed, which provided that no order of removal shall be made "unless on oath made, in which the facts wherever the deponent founds his belief that justice cannot be obtained in the county where the suit is pending, shall be set forth that the Judge may decide upon such facts whether the belief is well founded." This latter Act, though it solved some doubts, raised others, for in the *State* v. *Twitty*, 2 Hawks, 248, the affidavit for removal on the part of the State set forth that " the deponent believes the State cannot have a fair and impartial trial in the county of

STATE *v.* HILL *et al.*

Burke;" whereupon the case was moved to the county of Lincoln, and the party tried there and convicted. On appeal to this Court, the judgment was arrested upon the ground that the affidavit did not state the facts on which the deponent founded his belief, as was required by the Act of 1808, and so the Court of Lincoln had no jurisdiction. But the Court there say, that if the facts had been set forth, the Judge of the Superior Court and he alone must have decided on them. In the subsequent case of the *State* v. *Seaborn*, 4 Dev. 305, on the affidavit of the prisoner, his case was removed from Wake to Cumberland county, where he was tried and convicted. In this Court it was moved in arrest of judgment on the ground that his case was improperly moved from Wake, the affidavit not stating the belief of the prisoner that he could not obtain justice in Wake county. The judgment was not arrested, but the authority of Twitty's case was doubted. For if one Judge removes a case to another county on an affidavit which he deems sufficient, and the Judge of the other county refuses to try and disclaims the jurisdiction because he thinks the affidavit insufficient in law, or if he thinks the affidavit sufficient and exercises jurisdiction, but this Court, on appeal, arrests judgment because of the insufficiency of the affidavit, as was done in Twitty's case, it is at once seen what confusion and uncertainty would involve the administration of justice. Therefore in Seaborn's case it is said by the Court that "it seems indispensable that there should be a plain and certain method for the Court to which a cause is removed, to determine whether it is bound to try it, that is, has the power to do so, about which, if it stands on the force of the order, the minds of any two Judges may come to different conclusions of fact." The rule there declared is, that this Court will look into the affidavit to see whether the facts on which the applicant founds his belief are stated; if the facts are stated, this Court can go no further, for the Judge to whom the application is made, and he alone, decides on their sufficiency. It follows, according to these cases, that if

no facts are stated in the affidavit, the Court has no power to remove, but if the facts are stated, the Court is to decide on their sufficiency, and, in its discretion, grant or refuse the application. But this rule is not altogether satisfactory as furnishing an unerring guide to the Courts, for one Judge might differ from another as to whether the facts are stated or sufficiently stated, and so take or refuse to take jurisdiction of a case removed to his circuit for trial. It cannot be held, for instance, that a removal without affidavit would confer jurisdiction upon the Court of another county; a trial in the latter upon such a removal would be a nullity according to the cases we have cited.

Nor, on the other hand, ought it to be held that a mere defective statement of the causes for removal in the affidavit, makes the removal void and as conferring no jurisdiction to try. It might, however, be inferred from *Seaborn's* case, that such defective statement would be fatal, for the decision in that case is put upon the express ground, " that the affidavit comes up, in this respect, to the statutes." Doubtless, the most infallible rule would be to make the order of removal conclusive in all Courts, but this cannot be done without violating the plain words of the act and the decisions of this Court. The act authorizing the removal creates a new and special jurisdiction, and before that jurisdiction can be required, the conditions precedent must be complied with, and to that extent the power of removal is not a matter of discretion. But where the facts whereon the belief is founded, are set forth in the affidavit, so that, in the language of the act, " the *Judge* may *decide* upon such facts, whether the belief is well grounded," then the Judge acquires complete jurisdiction and his decision is final, and not the subject of review. It was so held by this Court in the later cases of the *State* v. *Duncan*, 6 Ired. 98, and in *State Hildreth*, 9 Ired., 429, and to that extent the question may be considered at rest.

In the case before us, the facts are sufficiently stated, and therefore the action of the Judge was final, and would have

been so, had he ordered the removal as prayed for, instead of denying the motion.   It will be observed that the statute does not impose a duty, but confers a discretion, and therefore it is always competent for the Court to refuse to remove.   In the exercise of the power of removal, this Court has inculcated a spirit of great liberality in favor of life, and that it ought to be a very clear case of demerit in the application, to justify the Judge in refusing to allow at least the first removal. · The administration of criminal justice must not only be impartial in fact, but the subjects of it should have the best reason to believe they have had a fair trial.   We have no reason to believe that the law has not been fairly administered in this case.

5. The question of severance in the trial is a matter of discretion with the Judge, and from his decision there is no appeal.   *State* v. *Collins and Blalock*, 70 N. C. Rep., 241; *Hildreth's case*, 9, Ired,, 429.

There is no error in the record.

PER CURIAM.                        Judgment affirmed.