STATE *v.* FINLEY.

STATE v. A. L. FINLEY, Jr.

*Murder in First and Second Degree—Severance in Trials—Judicial Discretion—Depositions in Criminal Actions—Conspiracy—Dying Declarations—Evidence Competent as to One Defendant Only—Refreshing Memory of Witness.*

1. Where several defendants are jointly indicted, a severance is within the sound discretion of the *nisi prius* judge, and his refusal of a motion for a severance will not be reviewed in the absence of abuse of such discretion.

2. Where there are several defendants in the same bill of indictment, it is not necessary to notify each of the others of the taking of a deposition by one for use as evidence on his behalf, under Laws 1891, Ch. 552.

3. A deposition taken under Ch. 552, Laws 1891, is competent to be read in favor of one prisoner, although it contains testimony charging his co-defendant with committing the crime. When so read it is the duty of the presiding judge to instruct the jury that they are not to consider it as evidence against the co-defendant thus charged with the crime, but only as evidence in favor of the prisoner who offers it.

4. When a wounded person has been told by a physician that his injury is fatal, and states himself that the wound will produce death, his dying declarations are properly received in evidence.

5. A witness who proposes to testify as to dying declarations can refresh his memory by looking at a deposition of deceased, taken in his presence, although such deposition is not competent as evidence in chief. It is not essential in cases of this kind that the witness should himself have written the matter from which he is to refresh his memory.

6. In the absence of any evidence of a conspiracy, if two persons are indicted for murder and the jury are in doubt as to which struck the fatal blow, they should acquit both; but, if a conspiracy between the prisoners is shown, they should both be convicted under such circumstances; for, having conspired together to commit the crime, they are both principals, and it is immaterial to inquire which of the two actually struck the blow.

7. If two persons conspire to vex, annoy and commit unlawful acts upon a third, and in the prosecution of their unlawful plans one of them kills their victim, they are both responsible for such homicide, although their original object in conspiring together did not compass so great a crime.

8. Now, as before the Statute of 1893, (dividing murder into two degrees,) the killing being proved or admitted, malice is presumed, and the burden is put upon the prisoner to establish, to the satisfaction of the jury, such facts and circumstances as will rebut malice and reduce the crime from murder in the first degree to a crime of inferior grade.

9. The instructions proper to be given on the question of murder or manslaughter, as pointed out in *State* v. *Locklear* and *State* v. *Thomas*, at this Term, approved.

STATE v. FINLEY.

INDICTMENT FOR MURDER, tried before *Bryan, J.*, at Fall Term, 1895, of McDOWELL Superior Court.

The appellant, A. L. Finley, Jr., and one James Jimmerson, were jointly indicted for murder, and both convicted of murder in the second degree.

A. L. Finley, Jr., appealed.

*The Attorney General*, for the State.
*Mr. J. F. Morphew*, for defendants.

MONTGOMERY, J. : The defendants, A. L. Finley and James Jimmerson, were indicted and tried jointly for the murder of L. H. McNish. On the trial his Honor denied a motion made, at the proper time, by the defendant Finley for a severance. The defendant alleged that the defenses of each of the accused were in antagonism as the foundation of the motion. An exception was filed on the ground that the denial of the motion was a gross breach of discretion on the part of the court. Unless the accused suffered some apparent and palpable injustice in the trial below, this Court will not interfere with the decision of the court on the motion for a severance. Although the defenses were in conflict and involved the admission of testimony which was competent as against one of the defendants and not against the other, yet his Honor, with entire certainty and clearness, carefully instructed the jury in the application of the evidence, explaining to them, by a proper analysis of the same, what part of it was competent against both and what part competent against one and not against the other ; and guarding them against being influenced against either of the defendants by such evidence as he had instructed them was only competent against the other one. We, therefore, refuse to interfere with the ruling of the court below. The matter was in the sound

discretion of his Honor, and from what appears it is certain that there was no abuse of that discretion. *State* v. *Oxendine*, 107 N. C., 783 ; *State* v. *Gooch*, 94 N. C., 987.

The second exception was to the ruling of his Honor, admitting, against the objection of the defendant Finley, the deposition of the deceased offered in evidence by the other defendant, Jimmerson, for himself and not against Finley. Due notice had been given to the solicitor of the district of the time and place for taking the deposition, and all of the other requirements of the law in respect thereto had been complied with. No notice, however, was given to the defendant Finley. Chapter 552 of the Acts of 1891 authorizes the defendant in criminal actions pending in the superior court, upon giving the notices and observing the other requirements named therein, to take the depositions of such persons so infirm or otherwise physically incapacitated that their attendance at court cannot be had, to be read on the trial. Because, also, of the failure to give the defendant Finley notice of taking the deposition, the objection was made. It was not necessary that Finley should have had any notice of the taking of the deposition, and his Honor committed no error in admitting it as testimony for Jimmerson. *State* v. *Kilgore*, 93 N. C., 533. When his Honor came to instruct the jury as to this evidence, he told them that the deposition was not evidence against Finley, and that they should consider only such parts of it as related to Jimmerson, and to consider no part of it which in any manner related to Finley or might in any way tend to prejudice their minds against him ; " that the deposition was taken under the statute without notice to Finley, and although the evidence contained in it charges Finley with the commission of the crime, you must not consider the same against him, and treat it as though his name had not been mentioned therein and not

allow it in any way to influence your verdict against Finley."

Particular exception was made by Finley to the admission of the testimony of James Smith, a witness for the State. This evidence is a part of the case on appeal, and appears in full in the original transcript. The witness did not say that Finley was absent or not near enough to hear what the deceased said in the drug store when he called on Dr. Morphew for protection. He said that, upon his coming up, he found both of the defendants and the deceased just outside the door of the drug store; that Finley walked around and "kinder brushed his foot like he was going to kick the deceased;" that then the deceased went into the drug store, Jimmerson going in afterwards, and laughing. The witness said nothing further about the position of Finley, except that when he left he was sitting on the steps.

Dr. White had already testified that Finley, at the time the deceased called on Dr. Morphew for protection, "was at the door making a noise, kinder noise like mocking him;" that Finley was near enough to hear him (deceased) if he had not been making a noise. He had testified further that the deceased stayed in the store five or ten minutes, and when he closed it for the night they went out together, finding Finley and Jimmerson there. Finley had on the deceased's cap, and in his raised hands had a board sign, like he was going to strike the deceased; that he told him not to have any row, and to get away.

Thomas Finley, a witness for the State, had testified that the defendant Finley was at the door outside two or three feet, and he thought was near enough to hear a conversation inside. The testimony of the witness Smith was competent against both defendants, and it was for the jury to determine whether the declaration of the deceased

STATE *v.* FINLEY.

was made in the hearing of defendant Finley; whether he heard and understood the statement, and, if he did, what his conduct was. It was for them alone to say what value was to be attached to the surrounding circumstances as tending to prove the defendant's guilt. *State* v. *Bowman*, 80 N. C., 432. Besides, enough testimony had already been given in to be submitted to the jury on the question whether there was an agreement and conspiracy between the defendants to do an unlawful act. The whole of the evidence, having been made a part of a case on appeal, and not having been printed in the case, discloses, upon an examination of it, numerous other exceptions made by defendant Finley.

The objections, all of them, are without force, and his Honor was right in overruling them and in receiving the testimony objected to. There was one, however, dwelt on with so much earnestness here that we will notice it particularly. The defendant Jimmerson had introduced for himself the deposition of the deceased, and it had been admitted by the court for Jimmerson but not against the defendant Finley. The State offered to prove by its witness, E. C. Hudgins, who was present at the taking of the deposition, the statements of the deceased made at that time as dying declarations. The witness stated that he was present the whole time, and that the deceased said the wound would be the cause of his death in a very short time. The undisputed testimony was that the skull had been crushed and broken; that both the doctors who had seen him had testified that the wound produced death, and that Doctor White had told him (deceased), about the time of taking the deposition, that he thought the wound would probably be fatal. There can be no doubt that the deceased knew that death was impending and that he knew the nature of the wound. He was near death, and

did die from the effects of the wound. The statements beyond question were admissible as the dying declarations of the deceased. *State* v. *Mills*, 91 N. C., 581. His Honor allowed, against the objection of defendant Finley, the witness to read over the deposition of the deceased, taken in the witness's presence, that he might refresh his memory in reference to the matter. The objection was properly overruled. It was not necessary under the circumstances that the witness should have written the paper himself in order that he might read it to refresh his memory. Greenleaf's Ev., Section 436; *State* v. *Staton*, 114 N. C., 813.

In considering the exceptions made by defendant Finley to the rulings of his Honor, refusing to give his special prayers for instruction and the exceptions of the charge as given, we find that much repetition of parts of the testimony will be saved by a succinct and connected recital of such parts of it as bear on the exceptions and charge; and for convenience and orderliness we will make such synopsis from the testimony of the witnesses. The deceased was a stranger in Marion, (he was from Rochester, N. Y.,) 42 years old, lame and with only one arm. He arrived in the town from Old Fort at eleven in the morning, and received the injury from which he died between ten and eleven o'clock of the night of the same day. He met both of the defendants, who were drinking freely, at a bar room. He took a drink with each of them. Presently the defendant Finley began to mock him, to box and scuffle with him, slap him over the head, and to take his cap from him. This treatment proceeded to such violence as to cause one Turnbill to interfere and to stop it, and to apologize for the rude behavior of Finley, stating " Bunk, (meaning Finley,) was a good boy and did not mean any harm." Very soon the bar was closed, the deceased and Finley

going out at one door, and the barkeeper and Jimmerson at the other. The barkeeper went on and left the deceased and Finley standing talking together, and Jimmerson about ten feet off. There was testimony going to show that just then the defendants, under a pretended power of arrest, took hold of the deceased and by force carried him to the calaboose, (town lock-up,) and after getting him there Finley pulled out his knife instead of a key and threatened to cut his throat. The deceased then broke away and went to the drug store of White & Morphew, near by, the defendants following him and overtaking him at the door Jimmerson pulled out a box from the store and sat down on it, within two or three feet of the deceased, while Finley walked around and " kinder brushed his foot like he was going to kick the deceased," the latter instantly going into the drug store and Jimmerson following him and laughing at him. The deceased at once called for Dr. Morphew and, upon his appearing, said, " Doctor, I want protection from these fellows." Jimmerson was then inside and Finley outside, leaning against the door, one side of the door being open, according to Dr. Morphew's testimony. Dr. White said that Finley was near enough to hear, if he had not been making a noise, mocking the deceased. Thomas Finley testified that the defendant Finley was near enough to hear a conversation inside. Deceased was bare-headed, and said they had his cap.. Dr. Morphew said the deceased had the Irish brogue and a peculiar walk, and that Jimmerson was laughing and Finley was mimicking him in talk and action. Upon closing the drug store for the night, Dr. White and the deceased went out together, when they found at the door both the defendants. The deceased said, " Give me my cap." Finley had on the cap of the deceased, and also at this time had a board sign several feet long raised like he was going

to strike the deceased, but desisted on being told by Dr. White not to have any row and to get away. Finley walked up a few feet from the drug store with the board sign in his hand. Dr. White went on his way up the street and the deceased in the same direction. White met Thomas Finley, (not the defendant,) and while they were talking, missiles like bottles were thrown from the direction in which the defendants had been left, and then the deceased came running trying to get behind them; and then the defendants came up, Finley in front and Jimmerson six or eight feet behind. Thomas Finley remonstrated. A few moments later, the deceased received a blow on the forehead, inflicted with some hard substance, which crushed the skull, including the inner table. There was ample testimony going to show that both defendants were present at the time the blow was struck; they both admitted that they heard the blow and saw the man fall. The defendant Finley said that he saw Jimmerson reach down and get into a "jower" with the deceased, heard a lick and saw the man fall. Jimmerson, on the other hand, said Finley hit the deceased with a rock. At the court-house next day, about the time of the justice's examination, the deceased recognized Finley as the one who had struck him, and so stated, near enough to be heard by Finley—one witness testifying that he must have heard the charge— no denial of it was made by Finley. In his dying declarations the deceased stated that the blow was given by Finley.

Eight special instructions were asked by the defendant Finley, three of which were given, and the 2nd, 3rd, 4th, 6th and 7th refused. The second is as follows: "If the jury are in doubt as to which one of defendants struck the blow, and have a reasonable doubt as to whether Finley inflicted the injury, or as to whether Jimmerson inflicted

118—74

it, then their verdict should be not guilty as to both."
The prayer in the abstract embraces a sound doctrine of
law; but where a conspiracy or an agreement between
two or more to do an unlawful act has been proved, and
as a result and consequence therefrom a crime is com-
mitted, the rule is different, and it is altogether an imma-
terial matter which one of the actors actually commits
the deed; they are all principals and all guilty of the
offence. *State* v. *Hill*, 72 N. C., 345. There was plenary
proof going to show a combination and conspiracy between
the defendants to commit an unlawful act, and in the
doing of it the deceased received a wound, by one or the
other of the defendants, from which he died. His Honor
properly refused this instruction.

We can consider together the third, fourth and sixth
exceptions, which are as follows: 3. "That if they
believe from the evidence that Jimmerson inflicted the
injury, the defendant Finley would not be guilty, unless
they find there was a conspiracy on the part of both to
commit the crime, or unless they find that Finley was
present aiding and abetting Jimmerson in its commission."
4. "That there is not sufficient evidence to go to the jury
of any conspiracy on the part of Finley with Jimmerson to
commit the offence charged." 6. "They must find beyond
a reasonable doubt, if they should find a conspiracy
existed at all, that such conspiracy must be to commit the
offence charged in the indictment, to-wit: the murder of
the deceased, and that no evidence of a common design or
purpose to tease, worry and have fun out of the deceased
would be such a common design and purpose as would
warrant the jury in finding a verdict against Finley, in
case they find that he did not strike the blow."

The above exceptions cannot be sustained. It was not
necessary to the conviction of Finley that the jury should

STATE v. FINLEY.

believe that the conspiracy between the defendants, if proved, extended to and included the commission of the crime charged in the indictment—murder.  It is sufficient if the defendants were engaged in any unlawful object, leading up to the killling of the deceased, to make them both guilty as principals.  The evidence tended strongly to show an agreement between the defendants to engage in the pursuit of an unlawful object, that is to worry and annoy, and to oppress and to assault the deceased by taking his cap from him, by boxing and slapping him violently, by threatening to put him in the lock-up, threatening to kick him, and drive him by their annoyances and persecutions to seek protection from them, by cursing him and chasing him up and down the street.  In *Regina* v. *Cox*, 4 C. & P., 538, the rule is thus laid down : " If two persons are engaged in pursuit of an unlawful object, the two having the same object in view, and in pursuit of that common object one of them does an act which is the cause of death under such circumstances that it amounts to murder in him, it amounts to murder in the other also."  The same doctrine is held in *State* v. *Simmons*, 6 Jones, 21, and in *State* v. *Gooch*, 94 N. C., 987.

We do not understand the theory upon which the defendant's counsel base their exceptions to those parts of his Honor's charge which they allege to be objectionable. There can be no valid objection to the court's definition of malice.  It is elementary learning.  And, on the question of murder in the first and murder in the second degree, the language of the court was the identical language which the same judge used in the first trial of the case of *State* v. *Fuller*, 114 N. C., 885, except the last sentence, and which was approved by this Court.  He said in the trial of that case that, " the killing with a deadly weapon being admitted or proved, and nothing else appear-

ing, the court charges you that no presumption is raised that it is murder in the first degree, and unless the facts and circumstances show beyond a reasonable doubt that there was a deliberate, premeditated, preconceived design to take life, it is murder in the second degree." This has been affirmed by this Court in *State v. Gadberry*, 117 N. C., 811, and in *State v. Locklear* and *State v. Thomas*, at this Term. Now, as before the Statute of 1893 dividing murder into two degrees, the killing being proved or admitted, malice is presumed, and the defendant, if he seeks to reduce the crime to manslaughter, must prove such facts and circumstances, to the satisfaction of the jury, as will rebut the presumption of malice. The defendant must show and prove all matters of excuse or mitigation upon which he relies to reduce the crime from murder to manslaughter. There are dozens of cases to this effect in our decisions, made before the Statute of 1893, and numbers of them will be found cited in the case of *State v. Rollins*, 113 N. C., 722. Since the statute, the same principle has been declared in *State v. Fuller* and *State v. Gadberry, supra*.

The defendant cannot complain because his Honor did not submit the theory of manslaughter to the jury. There was not one particle of evidence offered to show provocation—not a scintilla of proof, even, offered with a view to reduce the crime charged in the indictment to manslaughter.

From the light in which we view the testimony his Honor's charge was, if liable to exception, too favorable to the defendants and the judgment extremely lenient. The case was tried with thoroughness by his Honor and with absolute impartiality. There is no error and the judgment is affirmed.

Affirmed.