BROWN, J., dissenting; WALKER, J., concurring in the dissenting opinion.
The defendants, Wattie Greer and Wallace Greer, were indicted for the murder of one Will Finney, and from judgments rendered on a verdict of manslaughter, they appealed.
The first witness for the State, Delia Causer, testified as follows: "I live on Bath Street in Winston, and in the afternoon of the day when Will Finney was killed, I saw for the first time in my life Will Finney and Wattie Greer. They passed right up side of my house. They were coming up the street, both of them cursing each other. Will Finney was asking Wattie Greer for what he had snatched. Wattie Greer refused, and said: `I will give you a quarter,' and cursed him to his mother, and he cursed Wattie to his sister. Will Finney went right behind him, sorter to one side, and Wattie was ahead of him, but not in a direct route. Wattie got to his buggy, grabbed his whip, took it out of the socket to change ends, but before he got it straight, Finney was too close on him to hit, and they went together. There was a little wash where it rained, and that made Wattie's feet slip, and that threw *Page 530 
him some way and made his head fall near the horse, and the horse ran. They were down there scrambling, trying to get up. Will Finney had his left arm over Wattie. Wattie had his right over Will Finney. (642) I saw this man, Wallace Greer, coming running up, and hit him somewhere with the axe. I had not seen Wallace Greer until he came up with the axe and struck Will Finney somewhere about his head. Will Finney dropped sorter on the side of Wattie, and when he did, Wattie just whirled right there and began to mend him in the face with his fist. This was after he was struck with the axe. He also grabbed the whip and began to beat Will Finney in the face. I never saw Will Finney move any more after he was struck with the axe. Wattie hit him twice in the face with the butt end of the whip."
The husband of the above witness testified substantially to the same facts, but added that the deceased had a knife in his hand. It appears from the other testimony in the case that the dispute and quarrel between the deceased and Wattie Greer began shortly before, and while they were at the house of one Arthur Green. It appears that the deceased asked Wattie Greer for 25 cents, which Wattie owed him; that Wattie then had 75 cents in his possession, but that he refused to pay the deceased the 25 cents. Both were angry and profane, and vulgar words passed between them, in the course of which, as testified to by the defendant Wallace Greer, the defendant Wattie Greer said to the deceased: "If I had a match, I would strike it on your face."
Wallace Greer testified as follows:
"Q. You are charged with the killing of a man by the name of Finney. Go on and tell his Honor what took place that morning after you got in the neighborhood of where this thing happened, without any suggestion from me. A. Me and my brother went down there on Sunday evening between 4 and 5 o'clock; John Sheeks was with me and John Allen was with my brother, and we goes in Kid Green's house; I believe that's his name; after we had been in there about five minutes, Finney come in; I went back in the back room, and when I come out Finney had on my brother's hat; Wattie says, `Give me my hat,' and Finney says, `I ain't going to do nothing of the kind,' and Wattie reached up and grabbed his hat off of Finney's head. Finney (643) says, `You owe me a quarter for going away for you, and I got to have it.' Wattie says, `I ain't got but six bits, and you can't have them.' Finney says, `I am broke, and I want it.' Wattie says, `You can't get none of this.' Finney says, `I am going to have it before the sun goes down or kill you, one.' Wattie says, `If I had a match, I would strike it on your face,' and Finney says, `No, you won't do nothing.' *Page 531 
"Q. Well, did they get to cursing each other? A. Yes, sir; and Kid Green asked them to get out of his house, and they went on the porch and stood out there and cursed, and the other gentleman in the other end told Finney to quit so much cursing there; he had some children, and he didn't want the cursing there. I pushed my brother Watt and told him to go down off the porch and quit fussing; he went on the ground, and Finney steps behind him, and kept cursing, and Finney cursed him to his mother and his sister, and I says, `If you fuss with my brother Watt, you just fuss; but you leave my mother out of it.' He cursed me and cursed Watt, and I pushed Watt this way and Finney that way (indicating). I says, `Come on, now, and let's go to the pond.' Watt says, `All right.' I turned around and Watt started towards his buggy, and I goes on to King's; in front of this house was my buggy, and Watt goes to his buggy. I told John Sheeks to turn the buggy around, and I got up in the buggy; they were still walking on and I just got up in the buggy and set down like this, and went to pull my lines this way with the horse (illustrating); I just took my eyes off of my brother a minute when I went to get in my buggy, and just then I heard somebody holler, `Don't let him kill Wattie,' and I turned around and jumped out of the buggy, and I didn't know where the axe was, but I started on, and the axe was about as far as to that man (indicating), and when I heard them say, `Don't let him kill Wattie,' I jumped out and grabbed the axe (illustrating).
"Q. What was the position of Finney and Watt? A. My brother was laying back this way, and Finney had his hand this way, and I reckon his hand was going on down to cut him; Finney was on top of him, and had his hand up this way when I got there (644) (illustrating). Finney was on top.
"Q. What did he have in his hand? A. Knife.
"Q. Is this the knife? Or do you know? A. That looked like the same knife; I didn't pay much attention to the knife.
"Q. At the time you struck him, you say Finney had his hand back this way, raised over Wattie? A. When I jumped out and ran and grabbed the axe, Finney was fixing to hit him, and I struck him, and Finney fell back, this way (illustrating); my brother gets up and he says, `He cut me,' and I says, `Let's see,' and he turned around, and I see where he cut him and where it got hung in the coat there, and I say, `He got you there, didn't he?' and he showed me, and I say, `Well, let's go home.'
"Q. Did you or your brother hit him outside of that one blow you gave him? A. Didn't hit but once; when I hit him and he fell over *Page 532 
like that (indicating), Wattie he got up and showed me where he was cut; he say, `I wonder where we can get something to put on it.' I says, `Get in my buggy and let's go.'
"Q. You left there? A. Yes, sir.
"Q. Next morning did you surrender, or were you arrested? A. Yes, sir; next morning I surrendered."
Cross-examination:
"I surrendered the next morning after the killing. I did not hide that night, but come in the next morning and gave myself up. I do not know whether Arthur Green's house is a regular gambling place or not. I never gambled there. I had been there about five or ten times before the deceased come up. I went over in the buggy with John Sheeks. I might have met the deceased at the corner of King's house; but if I did, I did not pay any attention to it. I did not see Finney and Wattie discussing the quarter. We all just went down to visit Kid Green. I have gambled and have been indicted for gambling, but I was not gambling that afternoon. I never saw my brother borrow three quarters from John Sheeks, as I was in the other room, where I went to get a drink of water. When I come out, Finney had (645) my brother's hat, and my brother was asking for it. They started to cursing, and Kid Green asked them out of the house; they went out and they cursed on the porch and they cursed after they stepped on the ground. They both then started towards the buggy; I went off and got in my buggy. I heard the people screaming, and looked around, and I jumped right out, and grabbed the axe as I was on my way to where they were fighting. I was sitting in my buggy when I heard somebody scream. I was running towards my brother, and I saw the axe and grabbed it up. I did not see the axe when I jumped out of my buggy. I did not see anything to hit the deceased with when I jumped out of the buggy. I hit him as quick as I could get there. Wattie did not hit the deceased in the head or face either with his first or the whip. After it was over, I told Wattie to get in the buggy and let's go. I stayed at my sister's house. The officers did not go to my house to look for me. I was not at home that night, but stayed with my sister. I am under indictment now for keeping a disorderly house, and I was also indicted for breaking into Brown-Rogers' store, and served a term on the roads. I went in there with a white man about 7 o'clock in the evening. There was a man in the store who caught me. I went in the front door of the store. I have been in jail here for gambling.
There was other evidence tending to corroborate the defendant.
At the close of the evidence the defendants requested the court to charge as follows: *Page 533 
"1. That whenever there is a reasonable ground to believe that there is a design to destroy life, to rob, or commit felony, the killing of the offender to arrest such design is justifiable in law, and if you find from the evidence in this case that Will Finney had the defendant Wattie Greer on the ground, and had the knife which has been offered in evidence drawn and in a position to strike, that in order to prevent the destruction of life or the commission of a felony or the infliction of great bodily harm upon Wattie Greer, the defendant Wallace Greer rushed up with an axe and inflicted the wound which resulted in death, that such killing, under such circumstances, would be (646) justifiable, and you should so find."
The court refused to give this instruction, and the defendants excepted.
"2. The court charges you that one not engaged in a fight may oppose another attempting the perpetration of a felony, if need be, to the taking of the felon's life, as in the case of a person attacked by another, intending to murder him, who thereupon kills his assailant; and if you find from the evidence in this case that the deceased and the defendant Wattie Greer were on the ground, with the defendant on the bottom, or even by the side of the deceased, unarmed, and that the deceased had already inflicted a wound on the defendant and had his knife drawn in a striking position, that under such circumstances, if you so find, the defendant's brother, Wallace Greer, had a right, if the danger of death or great bodily harm was about to be inflicted on his brother, the defendant Wattie Greer, to strike with the axe in order to prevent the commission of a felony or the infliction of great bodily harm, and the killing of Will Finney, under such circumstances, would be justifiable, and your verdict should be for the defendants."
The court refused to give this instruction, and the defendants excepted.
"3. you are instructed, if you find from the evidence that Wattie and Wallace Greer are brothers, and that Wattie Greer was down on the ground with the deceased on top of him, or by his side, and the deceased had his knife drawn and had stabbed Wattie Greer, and was attempting to stab him again, that the relationship between the defendants Wallace Greer and Wattie Greer gave to the defendant Wallace Greer the right to interfere; and if it was reasonably apparent to Wallace Greer that his brother, Wattie Greer, was in imminent peril of death or great bodily harm, and that it was necessary for him to use the means or force which resulted in the death of Will Finney in order *Page 534 
to prevent the same, such killing, under such circumstances, on the part of Wallace Greer, was justifiable, and it will be your duty to give a verdict of not guilty as to the defendants."
(647) The court refused to give this instruction, and the defendants excepted.
His Honor charged the jury, among other things, as follows:
"Now, the rule is that where one is attacked he may defend himself, even to the extent of killing his adversary, on the principle that what one may do for himself another may do for him, if this other believes life to be in immediate danger; and if so, he may use such force as is apparently necessary to him to repel the attack of the aggressor, provided the party in whose defense he acts was not at fault; and so, if you find from the evidence in this case that the defendant Wattie Greer left Arthur Green's house, telling the deceased that he did not wish to have any trouble with him, or words to that effect, and went over towards his buggy, intending thereby to avoid the difficulty, and while at his buggy the deceased ran up to him with a drawn knife and struck at him, and the defendant Wattie Greer and the deceased fell to the ground, and while they were on the ground the deceased was making an attempt to stab the defendant Wattie Greer with his knife, and had the knife uplifted in a position to stab, and the defendant's brother, Wallace Greer, had reasonable grounds to believe that his brother, Wattie Greer, was in danger of death, or great bodily harm was about to be inflicted on him by the deceased, and he rushed up with an axe and struck the deceased the blow that caused his death, under such circumstances the defendant Wallace Greer had the right to use such force as was apparently necessary to prevent the commission of a felony or the infliction of great bodily harm, and a killing under such circumstances, if you so find the facts to be, would be justifiable, and your verdict would be `Not guilty.' Now, that involves the idea that Wattie Greer was not at fault; it is presenting that view of it if the jury should find that he left and told the deceased that he did not wish to have any trouble with him, or words of that character, and went over towards his buggy, intending thereby to avoid a difficulty."
And defendants excepted.
"So an important question for you to decide is as to whether Wattie Greer is guilty of willingly fighting or using language calculated (648) to bring on a fight, and a fight did follow accordingly. Would Wattie Greer and Finney have been guilty of an affray, of fighting together, if no killing had occurred? Would they both have been guilty? If they would, and you are satisfied of that beyond a reasonable doubt, then if Wallace killed to protect Wattie, they would both *Page 535 
be guilty at least of manslaughter, and of murder in the second degree if it was a malicious killing — killing with malice as well as an unlawful killing. So that your verdict can be murder in the second degree, or manslaughter, or not guilty, according as you shall find from the evidence."
And defendant excepted.
It will be noted that while the abstract proposition as to the right to prevent the commission of a felony is stated in the instructions prayed for, when it is attempted to apply the law to the facts several alternative propositions are stated, as "to prevent the destruction of life," or "the commission of a felony," or "the infliction of great bodily harm upon Wattie Greer."
The presiding judge is not required to dissect a prayer for instruction, but may consider it as a whole (Harris v. R. R., 132 N.C. 164), and neither of those requested could have been given unless Wallace Greer had the right to kill, if it was reasonably necessary to do so to avoid great bodily harm to Wattie Greer; and under the authorities here and elsewhere, he did not have this right if Wattie Greer was himself in the wrong.
This has been decided to be the law three times in this Court: S. v.Johnson, 75 N.C. 174; S. v. Brittain, 89 N.C. 504; S. v. Cox, 153 N.C. 645.
In the Johnson case the Court says: "The proposition is true that the wife has the right to fight in the necessary defense of the husband, the child in defense of his parent, the servant in defense of his master, and reciprocally; but the act of the assistant must have (649) the same construction in such cases as the act of the assisted party should have had if it had been done by himself; for they are in a mutual relation one to another." And in the Brittain case, in which father and son were indicted, after discussing the case of the father: "Our conclusions are equally applicable to the cause of J. W. Brittain as to that of his father, S. P. Brittain, for although a son may fight in the necessary defense of his father, yet in such cases the act of the son must have the same construction as the act of the father should have had if it had been done by himself; for they are in mutual relations to one another. S. v. Johnson, 75 N.C. 174; 1 Hale P. C., 484." And in Cox's case: "In the oral argument here the prisoner's counsel *Page 536 
earnestly contended that the prisoner had the right to enter the fight to protect his father; but he only had that right to same extent and under the same circumstances under which the father himself could have used force. If the father entered the fight willingly, and had not afterwards withdrawn from the fight and retreated to the wall, or if he had used excessive force, he would have been guilty if he had slain his assailant. The same principle would apply to the conduct of the son, fighting in defense of a father who had not retreated to the wall or if the prisoner used excessive force."
And the weight of authority elsewhere is in support of this principle.
In 1 Hale's Pl. Cr., 484, the author says: "The like law had been for a master killing in the necessary defense of his servant, the husband in the defense of the wife, the wife of the husband, the child of the parent, or the parent of the child; for the act of the assistant shall have the same construction in such cases as the act of the party assisted should have made if it had been done by himself, for they are in a mutual relation one to another." And in Whar. Hom., sec. 521: "The general rule, as ordinarily stated, is that a brother or other relative assisting another in resisting a wrongful act directed against the latter can use no more force than the person he assists would (650) be entitled to use, and that interference to protect a relative is not justified where the relative was the aggressor in the original difficulty. A person has a right to use violence in defense of another only when the imperiled person would have been justified in using it in his own defense. Both must have been free from fault in bringing on the difficulty."
In Stanly v. Com., 9 Am. St., 306; 86 Ky. 440, the Court, after discussing the right of one to defend himself, says: "Not only, however, may he do this, but another may do it for him. This other person, in such a case, steps into the place of the assailed, and there attaches to him not only the rights, but also the responsibilities of the one whose cause he espouses. If the life of such person be in immediate danger and its protection requires life for life, or if such danger and necessity be reasonably apparent, then the volunteer may defend against it, even to the extent of taking life, provided the party in whose defense he acts was not in fault."
In Wood v. State, 86 Am. St., 72; 128 Ala. 27: "One who intervenes in a pending difficulty in behalf of a brother and takes the life of the other original combatant, stands in the shoes of the brother, in respect of fault in bringing on the difficulty, and he cannot defend upon the ground that his brother was in imminent and deadly peril and could not retreat, unless the latter could have defended upon that ground *Page 537 
had he killed his assailant. Hence, in such cases it is a material inquiry whether defendant's brother was in fault in bringing on the difficulty with the deceased."
In S. v. Giroux, 26 La. Ann., 582; "The next exception was to the ruling of the judge refusing to charge the jury `that if from the nature of the assault Giroux had reasonable grounds to believe that the life of his wife was in danger, or some felony was about to be committed upon the person of his wife, and was at the time of the killing being inflicted upon her person, then the killing was done in self-defense.' This would have required the judge to assume the fact that the assault upon the wife was without provocation, for, if the wife was the aggressor, the killing would not be excusable in self-defense."
In Surginer v. State, 134 Ala. 125: "The right of one (651) to use violence in defense of another is recognized by the law only where the imperiled persons would have been legally justifiable in using like violence in his own defense, and in no case is a necessity for acting in self-defense regarded as ground for an acquittal unless the person seeking shelter thereunder was free from fault in bringing on the difficulty or had retired therefrom and was thereafter assailed."
In S. v. Cook, 78 S.C. 254, the circuit judge charged the jury: "But if your brother or one near and dear to you provokes a difficulty or puts himself in the wrong and brings it on, the law does not allow you to go there, take his place and kill that man and say you are guilty of neither murder nor manslaughter. The law does not give the person who is near and dear to you the right to provoke a difficulty and then let you come in and kill some one, when he has brought it on himself, and get out of it by your saying he was near and dear to you, and you did the killing on that account. But if he was without fault in bringing on the difficulty, and the law would justify him in defending himself, you have a right to go in and defend him. But if he brings on the difficulty and you take part, you do it at your own risk; and if he took life under similar circumstances and would have been guilty of murder or manslaughter, and you go in, take his place, and take life under those circumstances, then you are guilty of murder or manslaughter." This charge was sustained by the Supreme Court, and the Court says, after quoting from Hale and Wharton and citing other authorities in support of the principle: "We have endeavored to show the law as laid down by the circuit judge is firmly established. It is true, the rule may in exceptional cases work hardship; but the opposite rule would allow the innocent man who had been forced to strike in self-defense to be killed with impunity merely because appearances happened to be against him at the moment a partisan of his antagonist *Page 538 
reached the scene of conflict. The duty seems urgent to enforce rather than relax the rule which admits of no excuse for taking human life except necessity."
We are, therefore, of opinion that his Honor properly refused the instructions of the defendant, and that there is no error as to (652) Wallace Greer in the charge given. There are other exceptions, which we have considered and which require no discussion.
As to Wattie Greer, the court was requested and refused to charge, "that if you believe the evidence in this case, the defendant Wattie, Greer is not guilty of homicide, and you are instructed to return a verdict of not guilty as to Wattie Greer." This prayer should have been given.
There is evidence that Wattie and the deceased were engaged in a voluntary fight, but Wattie did not strike the fatal blow, and there is no evidence that he instigated it. The Attorney-General says in his brief: "We have not found in the record that Wattie Greer had a deadly weapon; any evidence of a conspiracy between Wattie and Wallace, or an understanding or common purpose between them, or any testimony from which the act of Wallace could be imputed to Wattie."
Although one may have had some difficulty with the deceased, he is not liable for a homicide committed at or about the same time by a third person who was acting independently, without any conspiracy or common design, even though the alteration brought on the fatal encounter, and the third person interfered to aid him. Title "Homicide," 21 Cyc., 692; see, also, Wharton on Homicide, secs. 50, 51; S. v. Kendall, 143 N.C. 659; S. v. Goode,132 N.C. 982; S. v. Finley,, 118 N.C. 1161; S. v. Howard, 112 N.C. 859; S.v. Scates, 50 N.C. 420.
There is no error as to Wallace Greer, and a new trial is ordered as to Wattie Greer.